No. 2--08--0171    Filed: 2-11-09

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06--CF--2082 |
| JOHN D. LINLEY, | ) ) | Honorable Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the opinion of the court:

Following a stipulated bench trial in the circuit court of Winnebago County, defendant, John D. Linley, was found guilty of possession of cocaine with intent to deliver (720 ILCS 570/401(c)(2) (West 2006)) and was sentenced to a seven-year prison term. On appeal, defendant argues that the trial court erred in denying his pretrial motion to quash his arrest and suppress evidence. We reverse.

At the hearing on his motion, defendant testified that, on June 5, 2006, at about 1:25 a.m., he was standing outside his home, talking to two individuals who were sitting inside a truck parked at the end of his driveway. The home was located at the corner of North Day Avenue and Liberty Street in Rockford. At that time, several police cars pulled up. Police officers emerged from the vehicles and confronted defendant. The officers grabbed defendant and placed him against the truck. One of the officers held defendant against the truck. Another officer conducted a pat-down search and removed various items from defendant's pants pockets.

Aaron Booker testified that he was a sergeant with the Winnebago County sheriff's department. He had worked for the department for 13½ years, having previously served for 7½ years as a patrol officer with the Loves Park police department. Booker testified that he had been trained in how to perform a pat-down search and that he conducted such searches frequently. On June 5, 2006, at about 1:25 a.m., Booker was dispatched to investigate a report of shots fired in the vicinity of an establishment known as the Two Wheel Inn. Booker had been dispatched to the same area in the past to investigate reports of shots fired, fights, domestic violence, and drug activity. Booker testified that gunshots were frequently reported in the area. After turning onto North Day Avenue, Booker observed a pickup truck with its engine running, sitting in the street at the end of a driveway. Defendant and another individual were standing outside the truck, talking to someone in the truck. Booker testified that "it appeared as if [defendant] was considering to run, so I had to approach him rather quickly, and he did not run, so I advised him to keep his hands on the truck where I could see them and started a patdown search." Asked why he believed that defendant might run, Booker responded, "[t]he mere action of backing away from the truck, the body language, suggestive body language, that made--He took a quick glance in the opposite direction of where I was, and then when I say that he decided not to, it's like his body relaxed as if to comply with *** what I was doing, what my action was." While patting down defendant's outer clothing, Booker felt a lump in defendant's pocket. Booker initially testified only that the lump was unusual. He later testified that he believed the lump was "an illegal drug or substance." Booker removed the contents of the pocket and discovered what appeared to be cocaine. Booker also removed, inter alia, a digital scale from defendant's pocket.

The trial court's ruling on the motion to quash and suppress presents mixed questions of law and fact. People v. Lee, 214 Ill. 2d 476, 483 (2005). "The circuit court's findings of historical fact will be upheld on review unless they are against the manifest weight of the evidence, but 'a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.' " People v. Nitz, 371 Ill. App. 3d 747, 750 (2007), quoting Lee, 214 Ill. 2d at 484. The ultimate issue of whether to quash and suppress is subject to de novo review. Nitz, 371 Ill. App. 3d at 750.

On a motion to quash and suppress, the defendant bears the burden of establishing a prima facie case that he was doing nothing unusual to justify the intrusion of a warrantless search or seizure. People v. Beverly, 364 Ill. App. 3d 361, 369 (2006). If the defendant makes the required showing, the burden shifts to the State to present evidence to justify the search or seizure. Beverly, 364 Ill. App. 3d at 369. There appears to be no dispute that defendant made a prima facie case, thus obliging the State to establish its justification for detaining and searching defendant. The parties are also in agreement that Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and its progeny supply the legal framework for determining the validity of the detention and search. In Terry, the United States Supreme Court held that the public interest in effective law enforcement makes it reasonable in some situations for law enforcement officers to temporarily detain and question individuals even though probable cause for an arrest is lacking. Terry authorizes a police officer to effect a limited investigatory stop where there exists a reasonable suspicion, based upon specific and articulable facts, that the person detained has committed or is about to commit a crime. Terry, 392 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880. During a Terry stop, an officer may frisk a person for weapons where the officer reasonably believes that he is dealing with an armed and

dangerous individual. People v. Davis, 352 Ill. App. 3d 576, 580 (2004). "This reasonable belief is met if a reasonably prudent person, when faced with the circumstances that the police confronted, would have believed that his safety or the safety of others was in danger." Davis, 352 Ill. App. 3d at 580.

This court has noted that "[w]hether an investigatory stop is reasonable is determined by an objective standard, and only facts known to the officer at the time of the stop may be considered." Nitz, 371 Ill. App. 3d at 751. In this regard, however, information known to all officers acting in concert is imputed to the officer conducting the investigatory stop. People v. Ewing, 377 Ill. App. 3d 585, 593 (2007). Where the officer conducting the stop acts on information or instructions received from another officer, the focus is on whether the officer communicating the information or instructions had reasonable suspicion. Ewing, 377 Ill. App. 3d at 593. If, as in this case, the officer initiating the stop relies on a dispatch, the officer who directed the dispatch must have possessed sufficient facts to establish reasonable suspicion for the stop. Ewing, 377 Ill. App. 3d at 594.

An investigatory stop need not be based on personal observations by the officer conducting the stop (or by those officers whose knowledge is imputed to the officer conducting the stop). See Nitz, 371 Ill. App. 3d at 751. A stop may also be based on information received from members of the public. Nitz, 371 Ill. App. 3d at 751. However, the informant's tip must bear " 'some indicia of reliability' " in order to justify the stop. Nitz, 371 Ill. App. 3d at 751, quoting Village of Mundelein v. Thompson, 341 Ill. App. 3d 842, 850 (2003). "[A] reviewing court should consider the informant's veracity, reliability, and basis of knowledge." People v. Sparks, 315 Ill. App. 3d 786, 792 (2000). Whether a tip is sufficient to support a stop is not determined according to any rigid test, but rather depends on the totality of the circumstances. Nitz, 371 Ill. App. 3d at 751.

The nature of the informant is relevant. All other things being equal, information from a concerned citizen is ordinarily considered more credible than a tip from an informant who provides information for payment or other personal gain. Nitz, 371 Ill. App. 3d at 752. Another significant factor in determining the reliability of a tip received from a member of the public is whether, prior to conducting a Terry stop, the officer is aware of facts tending to corroborate the tip. See Nitz, 371 Ill. App. 3d at 751. This court has observed that "[c]orroboration is especially important when the informant is anonymous [citation] and is even more important when the anonymous tip is given by telephone rather than in person." Nitz, 371 Ill. App. 3d at 751. There is authority, however, that a tip conveyed via an emergency telephone number--a 911 call for instance--should not be considered "truly anonymous," even if the caller does not specifically identify himself or herself. See People v. Schafer, 372 Ill. App. 3d 1044, 1050-51 (2007). The rationale is that such a caller is likely aware that, because the authorities often record emergency calls and have the means to instantly determine the telephone number from which a call was placed, they may therefore be able to determine the caller's identity. That an informant has placed his or her anonymity at risk may be considered in assessing the reliability of the tip. See Schafer, 372 Ill. App. 3d at 1050-51, citing Florida v. J.L., 529 U.S. 266, 276, 146 L. Ed. 2d 254, 263-64, 120 S. Ct. 1375, 1381 (2000) (Kennedy, J., concurring, joined by Rehnquist, C.J.); see also United States v. Ruidiaz, 529 F.3d 25, 30-32 (1st Cir. 2008) (rejecting defendant's argument that 911 call reporting gunfire was entitled to no weight, where the caller confirmed his telephone number and assured the 911 operator that police could return his call); People v. Polander, 41 P.3d 698, 704 (Colo. 2001) ("it has been noted that placing one's anonymity at risk is a factor to be considered in weighing reliability"); State v. Golotta, 178 N.J. 205, 219, 837 A.2d 359, 367 (2003) ("the State stands on firm constitutional ground when it treats the anonymous

9-1-1 caller in the same fashion as it would an identified citizen informant who alerts the police to an emergent situation").

Even when information comes from an identified informant, "it remains the case that a minimum of corroboration or other verification of the reliability of the information is required." Thompson, 341 Ill. App. 3d at 851. There is some authority for the view that "less rigorous corroboration" is required when the tip concerns an imminent threat to public safety. See Schafer, 372 Ill. App. 3d at 1052-53 (and cases cited therein); accord Commonwealth v. Campbell, 69 Mass. App. 212, 217, 867 N.E.2d 759, 763 (2007) (" ' "Particularly when a police officer receives information concerning an individual with a gun, the test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation" ' "). But see Rivera v. State, 771 So. 2d 1246, 1248 (Fla. App. 2000) (rejecting the State's argument that "the danger alleged in the tip [that two vehicles were exchanging gunfire on a public road] was so great that it justified the stop even without a showing of reliability"); Baptiste v. State, 995 So. 2d 285, 303 (Fla. 2008) (specifically endorsing Rivera's reasoning).

Mindful of these principles, we consider the circumstances of the present case. The State seeks to justify the investigatory stop and frisk for weapons on the basis of a combination of (1) information that was relayed to the arresting officer by a dispatcher and (2) matters personally observed by or known to Booker. It is useful to sort out the former from the latter. Booker had no personal knowledge that shots had been fired in the vicinity where he encountered defendant. In this regard, this case is distinguishable from the two cases on which the State principally relies: People v. Mendez, 371 Ill. App. 3d 773 (2007), and People v. Delaware, 314 Ill. App. 3d 363 (2000). In Mendez and Delaware, the arresting officers actually heard gunshots. Mendez, 371 Ill. App. 3d at

774; Delaware, 314 Ill. App. 3d at 365; see also People v. Rojas, 359 Ill. App. 3d 392, 408-09 (2005). Because Booker was merely responding to a dispatch, the State was obliged to show that whoever ordered the dispatch acted based on reliable information. See Ewing, 377 Ill. App. 3d at 593-94. The State failed to meet that burden; it offered no evidence whatsoever concerning the source or nature of the information underlying the dispatch. We are left to speculate why the dispatch was broadcast. Perhaps another officer heard gunfire, but was attending to other duties and could not investigate. More likely, perhaps, the information came from a civilian. If that is the case, however, his or her identity and the circumstances under which the information was given are unknown. We do not know whether the informant was a concerned citizen or a member of the criminal milieu; whether the report was made in person or by telephone; whether the informant identified himself or herself; whether the informant had a history of providing reliable information or a reputation for giving false reports; whether the report, if made by telephone, was made to an emergency telephone number; whether the informant personally heard gunshots or was relaying secondhand information; and whether the report was contemporaneous with the gunfire.

Per Schafer, the threat to public safety implicated by a report of gunfire might relax the need for corroboration, but, in our view, it does not permit reliance on a report lacking any indicia of reliability whatsoever. Thus, the mere fact that Booker was dispatched to investigate a report of gunfire carries little or no weight in the application of the totality-of-the-circumstances test.

The question then becomes whether what Booker personally observed and other facts personally known to Booker gave rise to: (1) a reasonable suspicion that defendant had committed or was about to commit a crime (justifying an investigatory stop) and (2) a reasonable inference that defendant was armed and dangerous (justifying a limited search for weapons). Although Booker

encountered defendant in a high crime area at a late hour, defendant was doing nothing particularly unusual. He was merely standing outside a private home--his own place of residence, as it turns out--talking to other people. Presence in a residential area--even one known as the site of frequent criminal activity--at a late hour is not enough to warrant an investigatory stop. See People v. Kipfer, 356 Ill. App. 3d 132, 138 (2005).

In deciding to stop defendant, Booker relied on defendant's body language, which suggested to Booker that defendant might try to flee. Flight from an officer is a significant factor to be considered as part of the totality of the circumstances, although it is not sufficient in and of itself to support an investigatory stop. People v. Ray, 327 Ill. App. 3d 904, 910 (2002). Here, however, defendant did not actually flee or even attempt to do so. The most that can be said is that Booker inferred that defendant briefly contemplated fleeing. The only specific facts that Booker could identify in support of the inference were that defendant stepped back from the truck and made a quick glance in the direction opposite Booker. Although an experienced police officer might be better equipped than a civilian to recognize the precursors of flight, by any standard the predictive value of defendant's behavior is meager at best. Perhaps defendant thought about running away. Perhaps he merely considered walking away. It is also possible that he was simply attempting to determine what had brought the police to his home.

We note that an encounter between a police officer and a private citizen that involves no detention or coercion does not implicate the constitutional right to be free from unreasonable seizures. People v. Luedemann, 222 Ill. 2d 530, 544 (2006). However, the citizen is free to terminate the encounter and go about his or her business. See Kipfer, 356 Ill. App. 3d at 140. Obviously, one's unwillingness to consent to an encounter with police cannot, ipso facto, create a

level of suspicion that would justify a <u>Terry</u> stop; were it otherwise, the consensual element of the encounter would be meaningless. Accord <u>Kipfer</u>, 356 Ill. App. 3d at 140.

Ultimately, however, the propriety of the <u>stop</u> is of purely academic interest in this case; even if the stop could be upheld, the protective search of defendant's clothing could not. Authority to effect a <u>Terry</u> stop does not automatically confer authority to frisk an individual. <u>Davis</u>, 352 Ill. App. 3d at 580. As noted, the officer must have reason to believe that the detained individual is armed and dangerous. Moreover, the officer must be able to point to particular facts that justify the search. <u>Sibron v. New York</u>, 392 U.S. 40, 64, 20 L. Ed. 2d 917, 935, 88 S. Ct. 1889, 1903 (1968). Thus, even if we assume, for the sake of argument, that the lateness of the hour, the character of the neighborhood, and Booker's belief that defendant considered fleeing could give rise to reasonable suspicion of criminal activity, without reliable information that shots had been fired in the vicinity there certainly were no particular facts that would have led Booker to reasonably believe that defendant was armed and dangerous. Accordingly, the frisk was improper and the evidence retrieved as a result of the search must be suppressed.

For the foregoing reasons, we reverse the judgment of the circuit court of Winnebago County denying defendant's motion to quash and suppress. Without the suppressed evidence, the State cannot prove beyond a reasonable doubt that defendant possessed cocaine with intent to deliver. Accordingly, we reverse defendant's conviction without remand for a new trial. See <u>Kipfer</u>, 356 Ill. App. 3d at 143.

Reversed.

McLAREN and BURKE, JJ., concur.