2023 IL App (1st) 221311

No. 1-22-1311

Opinion filed June 7, 2023

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Appeal from the |
|   v. | ) | Circuit Court of |
| | ) | Cook County. |
| MERRITT JONES, | ) | |
| | ) | No. ACC22013001 |
|     Defendant-Appellee, | ) | |
| | ) | Honorable |
| | ) | Carol M. Howard, |
| (Shotspotter, Inc., | ) | Judge, presiding. |
| | ) | |
|     Contemnor-Appellant). | ) | |
| | ) | |

_____

    JUSTICE BURKE delivered the judgment of the court, with opinion.
    Presiding Justice McBride and Justice D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     ShotSpotter, Inc. (Shotspotter), is a company that operates a gunfire detection and location system for the Chicago Police Department (CPD).[1] On November 7, 2021, Chicago police officers were responding to a ShotSpotter alert of suspected gunfire at 244 North Hamlin Avenue when they saw defendant Jones's vehicle drive into Garfield Park, which is on the east side of Hamlin. Police stopped defendant Jones's vehicle and, after noticing the odor of alcohol on his breath and his glassy and bloodshot eyes, arrested him for aggravated driving under the influence of alcohol (DUI) but recovered no firearms. Defendant Jones issued subpoenas to ShotSpotter, apparently in anticipation of filing a motion to suppress challenging the legality of the traffic stop. ShotSpotter responded to some of defendant Jones's requests and filed a motion to quash others. The trial court denied the motion to quash in part and ordered ShotSpotter to produce materials relating to the reliability of its system, both generally and in this incident specifically. When ShotSpotter did not comply with that order, the court held ShotSpotter in "friendly" contempt allowing an immediate appeal. See Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016) (allowing interlocutory appeals of contempt orders). On appeal, ShotSpotter contends that the trial court should have granted the motion to quash in its entirety because defendant Jones's subpoenas were overbroad and sought materials that are irrelevant to this case. For the following reasons, we affirm the trial court's ruling on ShotSpotter's motion to quash defendant Jones's subpoenas but vacate the contempt order and related $50 fine.

¶ 2                                    I. BACKGROUND

¶ 3                                       A. ShotSpotter

---

[1]ShotSpotter changed its name to SoundThinking on April 10, 2023. For the sake of simplicity, we will refer to it as ShotSpotter because the trial court and the parties' briefs use that name.

¶ 4      ShotSpotter uses acoustic sensors on buildings to detect potential gunfire and alert police to its location at a specific latitude, longitude, and street address.[2] When ShotSpotter sensors detect a "bang" or "pop" sound, known as an "acoustic pulse," they triangulate the location of the pulse and assign it a "machine classification," which is an initial determination of whether the pulse was gunfire. If the machine classification exceeds a certain probability that the pulse was gunfire, software forwards the incident to ShotSpotter's incident review center (IRC) for review by human analysts. IRC staff analyze the acoustic pulse and decide whether to report it to police. A report of gunfire sent to police includes the location by latitude, longitude, and street address of the suspected gunfire and an estimate of how many rounds were fired. It does not include descriptions of individuals or vehicles. ShotSpotter alerts are displayed to employees of the Chicago Office of Emergency Management and Communications (OEMC), analysts at CPD's strategic decision support centers, and on-duty officers who have the ShotSpotter mobile app on their work-issued smartphones.

¶ 5      Defendant Jones claims that ShotSpotter's reliability has been questioned in recent years. According to defendant Jones, an investigation by the Office of the Inspector General concluded that ShotSpotter alerts in Chicago between January 2020 and May 2021 led to evidence of a firearm-related offense approximately 9% of the time.[3] Similarly, a MacArthur Foundation study of ShotSpotter alerts in Chicago between July 2019 and April 2021 found that approximately 10% of alerts led police to incidents involving firearms. Defendant Jones claims that fireworks, vehicles

---

[2]We take this description of ShotSpotter's system from its motion to quash and the attached statement of a ShotSpotter forensic services manager. No witnesses have testified in this case regarding ShotSpotter's system and operations.

[3]We discuss the materials defendant Jones has cited only to provide background as to why he challenges ShotSpotter's reliability. We express no opinion as to whether ShotSpotter is reliable.

backfiring, and construction equipment frequently cause false positive alerts and that IRC analysts often reclassify or make changes to ShotSpotter alerts.

¶ 6                                B. Defendant Jones's Arrest

¶ 7    At 10:15 a.m. on November 7, 2021, ShotSpotter sensors detected an acoustic pulse on the 200 block of North Hamlin Avenue and assigned it a machine classification as gunfire. IRC staff determined that the pulse was caused by one gunshot and relayed the location of the suspected gunshot to Chicago police as 244 North Hamlin. According to defendant Jones's arrest report, officers responded to a shot spotter call at 244 North Hamlin and saw defendant's vehicle make a U-turn in the park and drive eastbound through the park. The officers conducted a traffic stop in order to conduct a shots-fired investigation. The officers approached defendant's vehicle "and due to the nature of the stop immediately asked the driver out of the vehicle and detained him in order to conduct a [*sic*] the previously mentioned shots fired investigation."

¶ 8    During a June 10, 2022, hearing on ShotSpotter's motion to quash defendant's subpoenas, the State claimed that the officers stopped defendant Jones's vehicle "[n]ot because of the ShotSpotter alert" but because he was "[b]locking the park driveway and then when the officers go to approach, looking in their direction, making a U turn, and driving through the park." The State's brief in this appeal acknowledges that the ShotSpotter alert has at least some relevance to the legality of the traffic stop that led to Jones's arrest.

¶ 9    Defendant Jones complied with the officers' orders to exit his vehicle, and the officers noticed a strong odor of alcohol on his breath and that his eyes were bloodshot and glassy. Defendant Jones did not produce a driver's license, and a police database revealed that his license was revoked. During a search of defendant Jones's vehicle, police recovered a quarter-full bottle

of vodka and two plastic cups containing suspected alcohol. Defendant Jones was arrested and transported to a police station. A chemical test administered at the police station indicated that defendant Jones's blood alcohol content was 0.296. Defendant Jones was charged with six counts of aggravated DUI premised on driving on a revoked license while under the influence of alcohol above the legal limit (625 ILCS 5/11-501(a)(1)-(2), (d)(1)(G), (H) (West 2020)).

¶ 10                                    C. Defendant Jones's Subpoenas

¶ 11    Defendant Jones issued seven subpoenas to ShotSpotter containing a total of 41 requests for documents. ShotSpotter produced materials in response to 22 requests, including "the audio files that ShotSpotter used in determining that there may have been gunshots, locations of sensors involved in the noise event, and several articles explaining how ShotSpotter operates."[4] ShotSpotter filed a motion to quash the remaining 19 requests. ShotSpotter argued that the information that defendant Jones's subpoenas sought was not known to the officers when they stopped defendant Jones's vehicle, so it was irrelevant to whether the officers had reasonable suspicion to conduct that traffic stop. Defendant Jones responded that he was entitled to discover information that ShotSpotter relayed to the officers, as well as information regarding ShotSpotter's reliability, because police can only conduct a seizure based on third-party information if that information is reliable. Defendant Jones also indicated that he planned to challenge the admissibility of ShotSpotter evidence under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which governs the admissibility of novel scientific evidence in Illinois. *People v. McKown*, 236

---

[4]ShotSpotter's production is not included in the record on appeal. This description of its production is from its brief.

Ill. 2d 278, 282 (2010). The parties disputed the following categories of requests in defendant Jones's subpoenas.

¶ 12    First, the defense requested information regarding the IRC analysts involved in this incident, including their names, contact information, qualifications, training, and proficiency testing results. ShotSpotter argued that this information was irrelevant because IRC staff "worked only to generate initial reports used for investigative and non-testimonial purposes" and asserted privacy concerns over IRC analysts' identities and personnel files. Defendant Jones contended that the ShotSpotter analysts who classified this event as gunfire are occurrence witnesses because they provided information that resulted in the officers' traffic stop and arrest of him.

¶ 13    Second, the defense requested records reflecting ShotSpotter employees' disagreements with machine classifications and IRC conclusions between January 1, 2020, and November 30, 2021, as well as "reclassification notices" and any requests to change classifications during that time. Essentially, defendant Jones sought records of any instance in which ShotSpotter changed its classification of an acoustic pulse. ShotSpotter argued that this request was overbroad and irrelevant because the acoustic pulse in this case was not reclassified. Defendant Jones contended that this information was relevant to ShotSpotter's "high percentage" of "false positive ShotSpotter alert[s] for gunfire."

¶ 14    Third, the defense requested ShotSpotter's software development and maintenance records, including algorithms that identify and locate gunfire. ShotSpotter objected to this request as overbroad, because it was unlimited in time, and as irrelevant, because defendant Jones could not connect errors in ShotSpotter's software to this incident. ShotSpotter also noted that it had already produced "the techniques and mathematics that its software uses," which defendant Jones's

experts could use "to interpret, validate, or contest [ShotSpotter]'s conclusions." Defendant Jones argued that ShotSpotter had admitted to software errors in certain Securities and Exchange Commission filings and that ShotSpotter's algorithms were relevant to its ability to reliably locate gunfire.

¶ 15    Fourth, the defense requested information regarding ShotSpotter sensors within a mile of the acoustic pulse in this case, including calibration and maintenance records. ShotSpotter argued that this request was overbroad and irrelevant because it sought information about sensors that were not involved in this incident. ShotSpotter also indicated that it had "already provided the precise latitude and longitude" of the sensors that detected the acoustic pulse in this case, as well as "a log that details the status and working order of those sensors for the time they detected the noise event." Defendant Jones argued that ShotSpotter produced no information about factors that could affect the performance of the sensors involved in this incident, such as their distance from the acoustic pulse and potential obstructions.

¶ 16    Fifth, the defense requested data and studies regarding ShotSpotter's reliability. ShotSpotter represented that it had already produced "detailed studies and similar documents that explain and corroborate its systems' reliability and operation, including a scientific paper describing" ShotSpotter's design and operation. ShotSpotter also objected to this request as effectively impossible to comply with and irrelevant because "information from the 1990s, or even the 2000s or 2010s" did not "bear[ ] on the performance of [ShotSpotter]'s sensors in 2021." Defendant Jones argued that ShotSpotter should either produce "validation testing" of its system in Chicago or confirm that no such testing occurs.

¶ 17    The final defense request was for ShotSpotter's procedures and protocols governing IRC analysis and communication with law enforcement. ShotSpotter objected to this request as overbroad, because it was unlimited in time and scope, and as improper, because defendant Jones sought "simply to troll through all of ShotSpotter's procedural records in hopes of finding some anomaly from which he could attempt to convince the Court of a broader pattern of failures." Defendant Jones argued that he sought to determine whether IRC staff followed procedures and protocols in this case.

¶ 18    During the June 10, 2022, hearing, the court quashed defendant Jones's subpoenas seeking ShotSpotter's software and algorithms and modified some of defendant's requests, limiting their scope and narrowing overbroad requests. The court ordered ShotSpotter to produce (1) records reflecting the qualifications, experience, and training of the IRC staff who analyzed the acoustic pulse in this case, but not their names or contact information; (2) records reflecting reclassifications of acoustic pulses in Chicago in the three months before and after November 7, 2021; (3) logs reflecting the last calibration, prior to this incident, of the sensors that detected the acoustic pulse in this case; (4) studies regarding the performance of the ShotSpotter system in Chicago or written confirmation that no such studies exist; and (5) policies and procedures that IRC analysts follow in evaluating acoustic pulses. The court explained that "if the State is going to use the ShotSpotter alert as the major basis for the stop *** then the question is was the alert or the system reliable?" The court further reasoned that CPD, by its "policies and actions in terms of directing officers to stop cars based on alerts, they are assigning reliability to these alerts." Therefore, the court concluded, ShotSpotter was required to produce information bearing on its reliability.

¶ 19 ShotSpotter refused to comply with the court's order to produce documents. Defendant Jones filed a petition for a rule to show cause as to why ShotSpotter should not be held in contempt. On July 22, 2022, to facilitate ShotSpotter's immediate appeal, the court entered a "friendly" contempt order holding ShotSpotter in civil contempt of court for not complying with the June 10, 2022, order. The court fined ShotSpotter $50, which was stayed pending appeal. ShotSpotter filed a notice of appeal on August 19, 2022. The notice of appeal indicates that ShotSpotter is challenging the trial court's rulings of June 10 and July 22, 2022.

¶ 20                                 II. ANALYSIS

¶ 21 On appeal, ShotSpotter contends that the trial court should have granted its motion to quash defendant Jones's subpoenas in its entirety, rather than allowing some of the discovery that defendant Jones sought. The crux of ShotSpotter's argument is that defendant Jones's subpoenas were overbroad and sought information that is irrelevant to this aggravated DUI case.

¶ 22                               A. Jurisdiction

¶ 23 Defendant Jones challenges our jurisdiction over this appeal. He acknowledges that ShotSpotter's notice of appeal was timely with respect to the July 22, 2022, contempt order, but argues that the substance of this appeal only challenges the partial denial of ShotSpotter's motion to quash on June 10, 2022. According to defendant Jones, that ruling was a final and appealable order that ShotSpotter failed to appeal within 30 days because ShotSpotter filed its notice of appeal on August 19, 2022.

¶ 24 Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016) allows an appeal from "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty." A notice of appeal pursuant to Rule 304(b)(5) "must be filed with the clerk of the circuit court

within 30 days after the entry of the final judgment appealed from." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). There is no dispute that ShotSpotter's appeal from the July 22, 2022, contempt order was timely. The question is whether that notice of appeal incorporates the trial court's partial denial of ShotSpotter's motion to quash on June 10, 2022.

¶ 25 A subpoena recipient who is ordered to produce documents may test the validity of that order in contempt proceedings. *People v. Shukovsky*, 128 Ill. 2d 210, 219 (1988). In reviewing a contempt order, we must examine the propriety of the underlying order that formed the basis for the contempt ruling. *People v. Cole*, 2017 IL 120997, ¶ 18; see also *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 189 (1991) (finding, in the context of a refusal to produce documents, "review of the contempt finding necessarily requires review of the order upon which it is based"). If the underlying order was invalid, then the contempt order must be reversed. *Cole*, 2017 IL 120997, ¶ 18. As a result, ShotSpotter's appeal from the contempt order premised on its refusal to produce documents necessarily includes review of the merits of the trial court's June 10, 2022, ruling on ShotSpotter's motion to quash. Jurisdiction is proper.

¶ 26 *People v. Doe*, 211 Ill. App. 3d 962, 965 (1991), which defendant Jones cites, explains that an order denying a motion to quash a subpoena "*can* be a final and appealable order" if the subpoena was served in an independent action, such as a grand jury investigation. (Emphasis added.) That is, in some cases, a subpoena recipient can bypass contempt proceedings and appeal directly from the denial of a motion to quash a subpoena. However, *Doe* does not stand for the proposition that a subpoena recipient who files an unsuccessful motion to quash and then pursues contempt proceedings *must* appeal from both proceedings separately. That would result in piecemeal appellate litigation, which we do not favor. *Voss v. Lincoln Mall Management Co.*, 166

Ill. App. 3d 442, 451 (1988). Moreover, defendant Jones's claim that the trial court's ruling on ShotSpotter's motion to quash was a final and appealable order is contrary to the general rule that an order denying a motion to quash a subpoena is not final and appealable. See *In re Marriage of Kruss*, 2021 IL App (3d) 190339-U, ¶ 15. Accordingly, we have jurisdiction to review the partial denial of ShotSpotter's motion to quash.

¶ 27                                    B. Motion to Quash

¶ 28    ShotSpotter contends that the trial court should have granted its motion to quash defendant Jones's subpoenas. Essentially, ShotSpotter argues that the materials that defendant Jones subpoenaed are irrelevant to this case because the ShotSpotter alert was not the legal basis for the officers' seizure of defendant Jones and, even if it was, the arresting officers know nothing about ShotSpotter's reliability or internal operations. ShotSpotter also raises specific objections to the categories of discovery that the trial court allowed, which we will address below.

¶ 29                                    1. Standard of Review

¶ 30    The parties disagree as to the applicable standard of review. ShotSpotter contends that we should review the partial denial of its motion to quash *de novo* because "[t]he facts are uncontroverted and the trial court misapplied the law to the facts."[5] Defendant Jones maintains that we should apply an abuse of discretion standard. Ordinarily, we review a trial court's ruling on a motion to quash a subpoena for an abuse of discretion. *Parkway Bank and Trust Co. v. Korzen*,

---

[5]In the alternative, ShotSpotter argues that we can reverse the trial court's ruling if it "is arbitrary or finds no support in the record," citing *People v. Alcantar*, 2018 IL App (1st) 162771-U, ¶ 27. *Alcantar* is an unpublished order under Rule 23, so we cannot rely on it, and ShotSpotter cannot cite it, "except to support contentions of double jeopardy, *res judicata*, collateral estoppel, or law of the case" or as persuasive authority if the order was issued after January 1, 2021. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021). ShotSpotter does not cite *Alcantar* for any of these purposes, so we will not consider it.

2013 IL App (1st) 130380, ¶ 62 (citing *People v. Paris*, 295 Ill. App. 3d 372, 378 (1998)); see also *People v. Sauls*, 2022 IL 127732, ¶ 32 ("A trial court's discovery rulings generally are subject to review under an abuse of discretion standard."). However, "the proper standard of review depends on the question that was answered in the trial court." *Cole*, 2017 IL 120997, ¶ 19. If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, we use a *de novo* standard of review. *Id.*

¶ 31 We find that the abuse of discretion standard applies. The parties dispute whether the ShotSpotter alert has any relevance, *i.e.*, relationship to the facts of this case. ShotSpotter contends that its alert to police on the morning of November 7, 2021, was not the basis for the officers' seizure of defendant Jones. Defendant Jones's arrest report indicates that it was. The trial court's ruling on ShotSpotter's motion to quash represents a factual determination that the ShotSpotter alert does have some relevance to the legal basis for defendant Jones's seizure. This case is more akin to a typical discovery dispute in which the trial court must tailor its discovery rulings based on the specific facts of the case to avoid discovery into irrelevant and overbroad areas. See, *e.g.*, *People v. Collins*, 2013 IL App (2d) 110915, ¶ 14 (reviewing the trial court's ruling on a subpoena for a police officer's employment records for an abuse of discretion).

¶ 32 The cases that ShotSpotter cites do not support *de novo* review. For example, *Norskog v. Pfiel*, 197 Ill. 2d 60, 71 (2001), concerned "whether disclosure of mental health information is prohibited by a statutory discovery privilege," a question of law to which *de novo* review applied. In this case, ShotSpotter does not raise any privilege that would bar discovery. *Cf. Janousek v. Slotky*, 2012 IL App (1st) 113432, ¶ 13 (discovery orders are generally reviewed for an abuse of discretion, but a trial court's determination as to whether a privilege exists is reviewed *de novo*).

Similarly, *People v. Campobello*, 348 Ill. App. 3d 619, 626 (2004) explained that a challenge to a subpoena on grounds of constitutionality is subject to *de novo* review. ShotSpotter's motion to quash did not raise any constitutional issues. Accordingly, we will review the trial court's orders for abuse of discretion. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 33                                    2. Merits of the Motion to Quash

¶ 34    ShotSpotter argues that defendant Jones's subpoenas are overbroad and seek information that is irrelevant to this case. A subpoena *duces tecum* compels a person to appear in court and present certain documents, records, or things. *Sauls*, 2022 IL 127732, ¶ 33. Subpoenaed documents are sent directly to the court, which determines the relevancy of the documents, whether they are privileged, and whether the subpoena is unreasonable or oppressive. *Id.* A criminal defendant has the right to subpoena documents under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), which applies to the states through the due process clause of the fourteenth amendment (*id.*, amend. XIV). *Sauls*, 2022 IL 127732, ¶ 33. To justify the issuance of a subpoena, the issuing party must show that (1) the materials sought are evidentiary and relevant, (2) the materials are not otherwise reasonably procurable by the exercise of due diligence prior to trial, (3) the requesting party cannot prepare for trial without such production and the failure to obtain the materials may tend to unreasonably delay trial, and (4) the subpoena was issued in good faith and not as a "fishing expedition." *Id.* (citing *People ex rel. Fisher v. Carey*, 77 Ill. 2d 259, 265 (1979), and *United States v. Nixon*, 418 U.S. 683, 699-700 (1974)). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). If the issuing party cannot make the four showings required by *Nixon*, then the trial court must quash the subpoena. *People v. Cannon*, 127 Ill. App. 3d 663, 665 (1984). "The trial court has broad discretion in ruling on issues of relevance and materiality ***." *People v. Williams*, 267 Ill. App. 3d 82, 87 (1994).

¶ 35 It appears that defendant Jones subpoenaed ShotSpotter primarily in anticipation of filing a motion to suppress the traffic stop that led to his arrest and the evidence against him. See *People v. Gaytan*, 2015 IL 116223, ¶ 20 (if officers lack reasonable suspicion for a traffic stop, then the traffic stop is unconstitutional, and evidence obtained because of the stop is generally inadmissible). In deciding defendant Jones's motion to suppress, the trial court will apply an objective standard and determine whether the facts available to the officers at the time of the traffic stop supported a reasonable belief that the traffic stop was appropriate. See *People v. Haddad*, 2021 IL App (3d) 180545, ¶ 15 (citing *People v. Close*, 238 Ill. 2d 497, 505 (2010)). Police may rely on communications such as radio bulletins to make traffic stops and arrests. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54. However, a "third party's information must bear some indicia of reliability and must be sufficient to establish the requisite quantum of suspicion." (Internal quotation marks omitted.) *Id.*; see also *People v. Linley*, 388 Ill. App. 3d 747, 751 (2009) (when a seizure is based on information received through a dispatch, the State is "obliged to show that whoever ordered the dispatch acted based on reliable information"). Therefore, defendant Jones's motion to suppress will put at issue (1) the objective facts known to the officers at the time of the traffic stop, (2) any communications or information the officers relied upon in making the traffic

stop, and (3) the reliability of the information upon which the officers based their reasonable suspicion for the traffic stop.

¶ 36    Defendant Jones's arrest report indicates that, at the suppression hearing, the ShotSpotter alert will be the officers' primary, and perhaps only, legal justification for seizing defendant Jones. Defendant Jones should be allowed to subpoena evidence regarding the ShotSpotter alert itself, what information ShotSpotter communicated to the arresting officers, and whether the ShotSpotter alert was reliable. The trial court's ruling on ShotSpotter's motion to quash accomplishes those goals. Records reflecting the qualifications, experience, and training of the IRC staff who analyzed the acoustic pulse in this case are relevant to the reliability of the information that the IRC communicated to CPD officers shortly before defendant Jones's arrest. Policies and procedures that IRC analysts followed in evaluating this acoustic pulse are relevant to understanding why IRC staff took the actions that they did in this incident. Logs reflecting the calibration of the sensors that detected the acoustic pulse in this case are relevant to whether those sensors were working properly on the day of defendant Jones's arrest. Records reflecting reclassifications of acoustic pulses in Chicago in the three months before and after defendant Jones's arrest and studies regarding the performance of the ShotSpotter system in Chicago are relevant to whether ShotSpotter, as a system, is reliably able to identify gunfire and direct police to the firearms that caused it.

¶ 37    Moreover, this discovery will allow defendant Jones to prepare for any testimony or argument that ShotSpotter alerts are reliable and often lead police to illegal firearms. The possibility that the State will present such evidence is not speculative; other courts have accepted such testimony in support of reasonable suspicion. For example, in *United States v. Hawkins*, 37

F.4th 854, 858 n.2 (2d Cir. 2022), "the responding officers testified that the [ShotSpotter] technology works with a reasonably high degree of accuracy," and one officer "testified that ShotSpotter reports, in her experience, were 'usually' accurate to the 'block.' " The Second Circuit found that the trial court "did not err in crediting the officers' reasonable reliance on the ShotSpotter report in supporting the reasonable-suspicion or probable-cause determinations." *Id.* Similarly, in *State v. Bellamy*, No. A-2978-16T2, 2018 WL 2925724, *4 (N.J. Super. Ct. App. Div. June 12, 2018), the court accepted a detective's testimony that he had "never responded to a ShotSpotter report of gunfire that was proven inaccurate." Defendant Jones should be allowed to prepare to cross-examine officers who testify similarly in a motion to suppress hearing by obtaining materials that shed light on ShotSpotter's reliability as a system.

¶ 38    The trial court conducted a thorough and thoughtful analysis of defendant Jones's subpoenas and ShotSpotter's objections to them. The court allowed some of defendant Jones's requests, limited others by time and location, and quashed others entirely. Additionally, the court ruled without the benefit of Illinois caselaw to provide guidance on these issues. The record does not support a conclusion that the trial court's resolution of this discovery dispute was arbitrary, fanciful, or such that no reasonable person would agree with it. See *Rivera*, 2013 IL 112467, ¶ 37.

¶ 39    ShotSpotter first argues that the subpoenaed materials are not relevant to defendant Jones's anticipated motion to suppress because the ShotSpotter alert was not the legal basis for the officers' seizure of defendant Jones. However, defendant Jones's arrest report states that the officers were in the area, stopped defendant Jones's vehicle, and ordered him out of the vehicle because they were investigating suspected gunfire in response to the ShotSpotter alert. ShotSpotter claims that, at the June 10, 2022, motion to quash hearing, the State represented that it will not present the

ShotSpotter alert as the legal basis for defendant Jones's seizure. However, the State's brief in this appeal does not take that position. On the contrary, the State maintains that the materials that the trial court ordered ShotSpotter to produce have limited relevance to (1) "the legality of the traffic stop that led to [defendant Jones's] arrest" in a motion to suppress and (2) potentially, at trial, "evidence regarding the course of the criminal investigation that led to [defendant Jones's] arrest." Additionally, ShotSpotter cites no authority for its suggestion that defendant Jones is barred from subpoenaing evidence for a suppression hearing simply because the State, at one point, suggested that there may be another legal justification for defendant Jones's seizure. Nor does ShotSpotter identify a mechanism by which defendant Jones can hold the State to its supposed representation that the ShotSpotter alert was not the legal basis for the traffic stop. ShotSpotter is essentially asking defendant Jones to trust that the officers will testify to a different, possibly unidentified basis for the traffic stop. That is not realistic, and it is not a basis for us to deny the discovery that defendant Jones seeks.

¶ 40    The cases that ShotSpotter cites on this point are distinguishable and do not support a conclusion that the materials defendant Jones seeks are irrelevant to his anticipated motion to suppress. For example, in *People v. Smith*, 161 Ill. App. 3d 213, 217 (1987), the Third District held that the defendant was not entitled to subpoena evidence to present a necessity defense that was not legally available considering the charges against her. In *Cannon*, 127 Ill. App. 3d at 666, this court held that the defendant was not entitled to subpoena the State for statistics regarding the revocation of felony probation to establish the State's bias against him as a minority. These cases do not analyze what evidence a defendant can subpoena to prepare for a suppression hearing, so they offer little guidance to us.

¶ 41    ShotSpotter next contends that the subpoenaed materials are irrelevant because they seek information that the officers did not know at the time of the traffic stop, namely, "information regarding ShotSpotter's reliability" and "information regarding the training, experience, and qualifications of ShotSpotter employees." ShotSpotter conflates two different principles of reasonable suspicion. It is true that reasonable suspicion is determined by the totality of the circumstances known to the officers at the time they seized the defendant. *Linley*, 388 Ill. App. 3d at 749. However, when an officer relies on information dispatched through police communication channels, he may only make a seizure if the person issuing the dispatch had information that amounted to reasonable suspicion to justify the seizure. See *United States v. Hensley*, 469 U.S. 221, 232-33 (1985). The reliability analysis examines the *source* of the information that was relayed to police, not what the officers personally observed or knew. *Linley*, 388 Ill. App. 3d at 749-51. For example, when officers seize an individual based on a tip from an informant, the informant himself must be reliable. *Id.* at 750; see also *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020) (analogizing a ShotSpotter alert "to an anonymous tipster"). The State will have to show that the information that ShotSpotter sent to police in this case was reliable, regardless of what the officers who seized defendant Jones knew or did not know about ShotSpotter's system. See *Linley*, 388 Ill. App. 3d at 751 (the State has the burden of establishing the reliability of third-party information relayed to police).

¶ 42    ShotSpotter also argues that defendant Jones can obtain the information he seeks by "cross examining the officers who relied upon ShotSpotter." This argument contradicts ShotSpotter's claim that the officers know nothing about the internal workings of ShotSpotter, *i.e.*, its reliability. Even if the officers are knowledgeable about ShotSpotter's reliability, defendant Jones need not

rely on the testimony of adverse police witnesses to discover information about ShotSpotter's reliability. The sixth amendment (U.S. Const., amend. VI) allows him to subpoena that information for himself. See *Sauls*, 2022 IL 127732, ¶ 33. And, as explained above, defendant Jones should be allowed to prepare to rebut any police testimony that ShotSpotter is highly accurate and often leads to illegal firearms.

¶ 43   ShotSpotter argues that the trial court's reasoning that "there *might* be a Chicago Police Department policy of stopping cars based on ShotSpotter alerts" was flawed because "there is no evidence of such a policy." (Emphasis in original). This argument is a strained interpretation of the trial court's reasoning. The court was not speculating that there was such a CPD policy that, in fact, caused the officers' seizure of defendant Jones in this case. Rather, the trial court was simply explaining that because the arresting officers relied on the ShotSpotter alert to seize defendant Jones—which the arrest report confirms—defendant Jones is entitled to discovery on ShotSpotter's reliability.[6]

¶ 44   ShotSpotter contends that the trial court erred by "fail[ing] to inquire whether [d]efendant could prepare for trial without production of the requested materials," which is part of the *Nixon* analysis. See *Nixon*, 418 U.S. at 699 (the party seeking discovery must show that "the failure to obtain such inspection may tend unreasonably to delay the trial"). It appears that defendant Jones sought discovery from ShotSpotter to prepare for his anticipated motion to suppress. Delaying that hearing by denying defendant Jones discovery would delay trial because his motion to suppress

---

[6]A CPD directive states that "ShotSpotter's audio sensors will guide field units by *** assisting responding officers in the apprehension of an offender or offenders." See Chi. Police Dep't Special Order S03-19(IV)(c)(3) (eff. July 5, 2017), https://directives.chicagopolice.org/#directive/public/6138 [https://perma.cc/6ATL-8L4Q]. We take judicial notice of this CPD directive, which is published on CPD's website. See *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 100.

must be resolved before trial. See 725 ILCS 5/114-12(c) (West 2020) (a motion to suppress evidence generally must be made before trial). Defendant Jones has established this *Nixon* factor. Moreover, the State's brief anticipates that the ShotSpotter alert may be introduced at trial as course-of-investigation evidence, further supporting our conclusion that the materials defendant Jones subpoenaed are necessary for him to prepare for trial.

¶ 45    ShotSpotter argues that defendant Jones's "requests for materials relating to [its] employees *** are improper because they intrude upon the privacy interests of the IRC reviewer who published the alert in this case." We disagree. The trial court specifically ordered that ShotSpotter would *not* produce the name or contact information of the IRC analysts who analyzed the acoustic pulse in this case. Defendant Jones will not even know who these individuals are; he will only know their training and qualifications. We cannot see how the training and qualifications of anonymous ShotSpotter employees implicate "privacy interests." ShotSpotter does not explain, as a practical matter, how they do.

¶ 46    ShotSpotter objects to the trial court's six-month window for reclassification notices as overbroad. We disagree. A sufficiently large sample size of reclassification notices is necessary for defendant Jones to draw conclusions about ShotSpotter's reliability. ShotSpotter does not explain why a six-month window is overbroad, nor does it propose a narrower window.

¶ 47    Finally, ShotSpotter argues that producing the policies and protocols that IRC staff followed in this case will be overly burdensome. ShotSpotter claims that complying with this part of the trial court's order will require assembling over 25 years' worth of documents, some of which are in "deep storage" on backup servers. While we do not know how ShotSpotter stores documents, that degree of burden seems unlikely. All the requests that the trial court ordered ShotSpotter to

respond to are limited to the specific ShotSpotter alert in this incident on November 7, 2021. All the requests begin, "Regarding Flex ID #872-523762 from on or about November 7, 2021 at 10:05:09," and then seek protocols and policies for how ShotSpotter employees handled that alert. Given this limitation, we cannot see why ShotSpotter would be obligated to produce policies from 25 years ago. If a policy or protocol was not in effect on November 7, 2021, then it is not responsive. ShotSpotter should at least try to respond to this request before complaining that it is hopelessly burdensome.

¶ 48    To be clear, we express no opinion as to whether the officers had any legal justification to stop defendant Jones's vehicle or arrest him or whether ShotSpotter is reliable for purposes of the fourth amendment. The trial court can decide those issues in a suppression hearing. Moreover, this opinion does not stand for a general proposition that defendants are entitled to broad discovery of ShotSpotter in any case involving a ShotSpotter alert. We only hold that the trial court did not abuse its discretion by allowing some discovery of ShotSpotter where the record indicates that a ShotSpotter alert was the only reason that police stopped defendant Jones's vehicle and ordered him out of it.

¶ 49    Accordingly, we affirm the trial court's ruling on ShotSpotter's motion to quash defendant Jones's subpoenas. Because the circuit court issued a "friendly contempt" order to facilitate immediate appeal under Rule 304(b)(5), we find it appropriate to vacate the finding of contempt and the $50 fine. See *BorgWarner, Inc. v. Kuhlman Electric Corp.*, 2014 IL App (1st) 131824, ¶ 35.

¶ 50                                    III. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the trial court's ruling on ShotSpotter's motion to quash but vacate the trial court's order of contempt and fine against ShotSpotter.

¶ 52    Affirmed in part and vacated in part.

*People v. Jones*, 2023 IL App (1st) 221311

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. ACC-22013001; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew C. Crowl and Adam Safer, of Riley Safer Holmes & Cancila LLP, of Chicago, and Warrington S. Parker III (*pro hac vive*) and Kevin D. Cacabelos (*pro hac vice*), of Crowell & Moring LLP, of San Francisco, California, for appellant. |
| **Attorneys for Appellee:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Celeste Addyman and Adair R. Crosley, Assistant Public Defenders, of counsel), for appellee Merritt Jones. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein and Jonathon D. Byrer, Assistant State's Attorneys, of counsel), for the People. |