2025 IL App (1st) 231102-U

Fourth Division
Filed May 29, 2025

No. 1-23-1102

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| ANTHONY JACOB MEHERG, a Minor, By and Through His Mother, Angela Prieto, <br><br> Plaintiff-Appellee, <br><br> v. <br><br> RUSH UNIVERSITY MEDICAL CENTER, <br><br> Defendant and Contemnor-Appellant. | Appeal from the <br> Circuit Court of Cook County <br><br> No. 2018 L 003531 <br><br> The Honorable Thomas M. Cushing, <br> Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1     *Held:* The trial court's finding that defendant, a hospital, failed to produce audit data requested by plaintiff and certain entries in plaintiff's electronic medical record was against the manifest weight of the evidence. Although the trial court reasonably found that hospital's failure to disclose records from a separate system in its possession, that conduct did not violate any court orders. Hence, there was no factual basis for holding defendant in contempt, so the finding of contempt was vacated, and the cause was remanded.

¶ 2     This appeal arises out of a four-year-long discovery dispute over medical records. The nominal plaintiff, Anthony Jacob Meherg, was born in 2014 at the defendant hospital, Rush University Medical Center. The underlying complaint, filed on his behalf by his mother, Angela Prieto, alleges that he sustained lifelong perinatal injuries as a consequence of professional negligence by Rush personnel. The chief issue on appeal is whether the trial court correctly found

that Rush had disregarded its order to produce a full history of revisions to Prieto's electronic medical record. We find that the record does not support the trial court's determination that Rush failed to produce the revision data. We also find that there is no other basis for sustaining the contempt order, which we vacate, and we remand for further proceedings.

¶ 3                                    I.  BACKGROUND

¶ 4         Anthony was delivered by emergency C-section at Rush University Medical Center on March 30, 2014, less than three hours after Prieto, 40 weeks pregnant, came to Rush's obstetrics triage after having noticed decreased fetal movement. Materials in the record indicate that, around the time of birth, Anthony experienced a "hypoxic ischemic event." In 2018, Prieto filed a complaint on Anthony's behalf against Rush for professional malpractice, alleging that Rush personnel had negligently failed to ascertain the nature of his prenatal distress and respond appropriately, causing him to suffer brain damage and other injuries.

¶ 5                              A.  Rush's Initial Productions

¶ 6         In January 2019, Prieto asked Rush to produce (1) her and Anthony's electronic health records, (2) an "Audit Trail" for each record, and (3) an "Access Log" for each record. She defined an Audit Trail as "the part of the patient's [electronic health record] that displays any person logging in to the record to modify the record, correct the record, add to the record, alter the record, revise the record, complete the record, put finishing touches on the record, and any other entry or access into the medical record, or any other name synonymous with the reflection of who, when and what a person did in relation to the Electronic Health Record." Her request did not specifically define what an Access Log is, but it described what it sought as a document "reflecting the actions in the [electronic health record]" presented "in chronological order" and sorted by the patient, not each individual user, "so as to create a continuous chronology of events."

¶ 7         In response to Prieto's request, Rush produced each patient's medical record in PDF format. The two records included the same general kinds of materials—progress notes, doctor's orders, test results, and so forth. For entries that were edited at some point in time, the records included

each version of that particular entry. So, for instance, Prieto's record includes two versions of a note from her initial prenatal visit: the first was authored by a resident, and the second was authored by an attending physician, who simply added a boilerplate statement that she agreed with the resident's plan of care.

¶ 8    Rush also produced for each patient an "Access Logging Report" (*i.e.* access logs) that documented each instance where somebody accessed the associated medical record. The access logs were initially produced in PDF format and only documented access events that occurred during their respective patients' hospital admissions at the time of Anthony's birth: March 30 through April 3, 2014, for Prieto and March 30 through May 14, 2014, for Anthony. For each access event, the access logs listed the date and time, the user, the workstation used, and the "module" accessed within the record. The access logs did not disclose what changes a user may or may not have made or anything the user might have done other than access the record.

¶ 9    When Rush produced the access logs, it referred to them as "audit trails." As the access logs did not note any changes that a user might have made to the record being accessed, Prieto deemed that production unsatisfactory. During the summer of 2019, the parties engaged in Rule 201(k) conferences to try to resolve the issue, but their efforts did not bear fruit. In September 2019, Prieto filed a motion to compel asking the court to, among other things, order Rush to produce her electronic health record "in its native format." The motion asserted that Prieto had "attempted to conference with [Rush] on multiple occasions regarding the audit trail format and contents" to no avail. The next day, Rush produced more access logs, this time as Excel spreadsheets. The logs for Anthony's electronic medical record once again covered March 30 through May 14, 2014. The logs for Prieto's electronic medical record were more extensive than the logs Rush had produced in June, covering access events from October 10, 2013, through April 3, 2014. As before, the access logs did not disclose whether the accessing user made any changes to the electronic medical record.

¶ 10    At a case management conference held in September 2019, counsel for Prieto explained that the access logs were insufficient because they did not disclose what, if anything, the user did while accessing a record. Rush's attorney maintained that any changes the user might have made to the

record was "not in any audit trail." The court disagreed and observed that it had, in chambers, audit trails recording changes made to medical records. At that point, Prieto's lawyer indicated that he intended to request an on-site, video-recorded inspection of the live electronic medical record system in the presence of the court. Rush objected, arguing that there were no questions about the veracity of the medical records to justify an on-site inspection. The court rejected that argument, remarking, "[I]t's either have the changes or I'll [*sic*] file a motion, you can notice it up for a week from today, for the inspection." It granted Prieto's motion to compel, ordered Rush "to produce [an] audit trail containing modifications and revisions" by October 3, and directed Prieto to file a motion for an inspection and set it for hearing on October 3.

¶ 11     At the October 3 hearing, Rush appeared through both its retained counsel of record and through in-house counsel. Rush did not dispute that it had not produced a separate audit trail showing revisions and modifications, but it argued that all revisions were documented on the face of the medical records, which included "every version of the note." It maintained that it was not required to keep a separate log of changes and that it had no way to generate one. Over Rush's objection, the court ordered an on-site inspection.

¶ 12     Rush moved to reconsider, supporting its request with an affidavit from Robert Narowski, the Director of Clinical Information Systems at Rush. In his affidavit, Narowski asserted that the printed or PDF version of the medical record produced by Rush "may contain all versions of the entries entered in the patient's electronic medical record, including the original version and any revised versions of the medical providers' entries." To the best of his knowledge, based on Rush's discussions with Epic Systems, who provided the electronic medical record software Rush used, the system in use at the times relevant to this litigation "did not have the ability to document specific, word-for-word changes ('note attribution information') made to a patient's electronic medical record in an audit log." While "subsequently developed" versions of the Epic software had that capability, that newer software did not make it possible for Rush to create logs of word-for-word revisions to records created by older versions of the software. The court denied the motion to reconsider.

¶ 13             B.   The Inspection of Rush's Live Records System

¶ 14       The inspection took place on the afternoon of February 28, 2020, at a Rush facility on the near west side of Chicago. During the inspection, Rush personnel operated the live Epic electronic medical record system, using it to access records concerning Prieto at the direction of her attorneys and her technical consultant, Andrew Garrett. Two Rush officers answered questions under oath: Narowski and Thomas Andrew Reeder, an associate vice-president for HIPPA privacy and security.

¶ 15       Narowski testified about the Epic electronic medical record system. He demonstrated its operation, explained what the parties were seeing as he navigated it, and showed how certain documents were linked to other parts of the record. At one point, at the direction of Garrett, he demonstrated how to access a "revision history" for documents that had multiple versions. The videorecording of the inspection reveals that, like the printed medical record, the note revision history showed multiple versions of the same note, with the same information presented in the same order.

¶ 16       Reeder testified about Rush's access logs. He explained that the access log reports, which were generated using an application called Business Objects, did not draw data directly from the live electronic medical record system but used a separate database known as Clarity that pulled data from the live system once per day. After he testified that there was a separate "audit trail viewer" tool available on the live system that might provide more information than what was available through Business Objects and Clarity, he logged into the audit trail viewer. Similar to the access log, the audit trail viewer showed the parties a list of user interactions with the electronic medical record. Unlike the access logs, the events reflected in the audit trail viewer went beyond mere access. Each entry included the date and time of the event and the user. Each entry also listed the general "type" of event: *e.g.* viewing, printing, exporting, and modifying. Each entry also noted the part of the medical record that the user interacted with, such as reports, related encounters, demographics, problem lists. Where applicable, the audit trail viewer also tied the event to a specific encounter. Although the audit trail viewer the listed modification events, however, it did not disclose the substance of the modification. At the request of Prieto's team, Reeder used the

audit trail viewer to access and save information pertaining to Prieto's records from December 13, 2013, through April 19, 2018.

¶ 17                                    C.  Sanctions

¶ 18        After the inspection, Prieto asked Rush to produce, among other things, the "audit data saved to PDF during the inspection" and the "audit trails ran [*sic*] during the inspection (potentially not saved to PDF)." The court ordered Rush to respond to the request by March 19, 2020, and scheduled a case management conference for March 20. That hearing was postponed when the courthouse closed in response to the COVID-19 pandemic, and the parties would not appear before the court again for several months. Having not received anything from Rush in response to her post-inspection requests, on June 4, 2020, Prieto filed a motion for sanctions based primarily, though not entirely, on Rush's failure to produce audit-trail data. Prieto asked the court to strike Rush's pleadings, bar Rush from calling witnesses or asserting defenses, and award her costs and fees. Rush filed its response on June 16, and Prieto filed her reply on June 23.

¶ 19        Over the next several months, the parties continued arguing about the audit trail and several other disputes that arose from their inability to resolve the audit-trail issue. Because they could not agree on a case management order to get the case moving again after the court resumed its business, they did not come back before the court until an October 8, 2020 remote hearing on a separate sanctions motion Prieto had filed in August (the details are not germane). At that hearing, the court indicated it would issue a written order resolving several pending motions, including the June sanctions motion, and it set the matter for a case management conference on November 12. Owing to a docketing error, the planned conference was not actually held.

¶ 20        The court had still not taken any further action when, on December 18, 2020, Rush issued its response to Prieto's post-inspection request for production. This production included what Rush described as "audit data for the dates December 13, 2013 to April 9, 2018, exported from the Epic Audit Trail Viewer" related to Prieto's records. It also included "the Epic Access Log for the dates December 13, 2013 to April 9, 2018," again related to Prieto's records. The record on appeal

includes the access logs from this production, which were identical in form to the access logs Rush had previously produced. The record does not include the "audit data," so it is not clear what, precisely, it was that Rush produced, but Prieto has not disputed that this production included the materials viewed and saved during the live inspection.

¶ 21 Even so, Prieto found Rush's production unsatisfactory. In late December, the court ordered the parties to confer and attempt to resolve their various pending motions, including the sanctions motion, by agreed orders. And once more, the parties were unable to reach an agreement.

¶ 22 In May 2021, Prieto filed a memorandum in support of her still-pending June 2020 motion for sanctions. Notably, she did not allege that Rush had not produced the information exported from the audit trail viewer during the live inspection. Instead, she argued that the information was still "*not* a complete Audit Trail in that it omit[ted] the revision history." The motion was supported by the affidavit of Garrett, in which he opined that Rush's December 2020 production was "incomplete" and did "not reflect usable or meaningful data when compared to the requirements" of federal law. He asserted that the production included spreadsheets that had been "changed from their original format by adding logo's [*sic*] [and] locking the file to prevent downloading," and he noted that the files indicated that they had last been modified by counsel. Garrett further asserted that Rush had not produced data associated with certain features found in electronic medical record systems designed by Epic. He specified that the production had not included an audit trail for (1) "chart corrections," which were modifications to be made to digitally signed and stamped records; (2) "Care Everywhere," which was a framework that allowed medical personnel to access health records maintained by other providers; and (3) the "Release of Information" module, whose capabilities enabled it to restrict or filter data when generating auditing data. Garrett's affidavit also included a graphic purportedly showing "auditing data readily available within the record." It is not clear where the graphic originated, although Rush later asserted that was a screenshot of a different hospital's electronic medical record system.

¶ 23      Before filing its response, Rush sought leave to depose Garrett, arguing that it could not respond to Prieto's memorandum without an opportunity to probe his qualifications, the basis for his opinions, and the conclusions set out in his affidavit. The court denied that request.

¶ 24      Rush's response, which was filed in August 2021, was supported by affidavits from the two Rush officers who had testified at the live inspection, Narowksi and Reeder. Narowski reiterated Rush's position that the revision histories were shown in the body of the medical record itself, which contained each version of a particular record. He averred that the "chart corrections" functionality referred to in Garrett's affidavit had not been available until 2018 and that the Care Everywhere system had not been adopted until July 2014, which both postdated the records at issue in this case. He also stated that, to his knowledge, no restrictions or filters had been placed on the audit data produced to Prieto. Reeder averred that his department had compiled the documents and data requested after the inspection and that, to his knowledge, Rush had provided everything that Prieto had requested. He further averred that no documents or data had been withheld and that, other than limiting it to the dates stated at the inspection, no restrictions or filters had been placed on the audit data produced.

¶ 25      On January 18, 2022, the trial court granted Prieto's motion for sanctions, and it struck Rush's answer to the complaint, granted judgment against Rush as to liability, and ordered further proceedings to determine damages. In a lengthy memorandum order, the court found that Rush had engaged in a variety of misconduct throughout the discovery process, misconduct that warranted the harsh sanction it had chosen. As we explain below, most of those findings are not before us, so they require no elaboration. Relevant to this appeal, the court found that Rush was still not in compliance with the court's orders requiring it "to produce *any and all* auditing and EHR information pertaining to Prieto and Meherg's medical records." In particular, it found that Rush still had not produced "the revision histories" that Garrett had pointed out at the live inspection.

¶ 26      Rush filed a motion to reconsider. It argued that the trial court's finding that it had failed to produce a history of revisions to the medical records was factually inaccurate because the revision

history was disclosed on the face of the medical records themselves. It again argued that its record systems were not technologically capable of generating a log of specific, word-for-word changes made in each version of a record and that requiring Rush to create one would be disproportionate under Illinois Supreme Court Rule 201(c)(3) (eff. July 1, 2014). The court denied the motion to reconsider on December 29, 2022.

¶ 27                                    D.  Friendly Contempt

¶ 28      In March 2023, Rush challenged the sanctions order by filing a motion for supervisory relief in the supreme court. The motion sought three alternative remedies: (1) vacatur of the sanctions order and directions to proceed with discovery and trial on the merits; (2) directions to allow discovery on the capabilities of Rush's electronic medical record system and to hold an evidentiary hearing on the matter; or (3) vacatur of the partial default judgment and directions to find Rush in friendly contempt, facilitating an appeal. On May 18, 2023, the supreme court allowed the motion and directed the trial court to "vacate its January 18, 2022, order granting judgment against RUMC on the issue of liability" and "enter an order finding movant in friendly contempt."

¶ 29      Consistent with the supreme court's directive, on May 26, the trial court vacated the January 18, 2022 memorandum order, held Rush in friendly contempt, and imposed a $50 penalty. At Rush's request, it also stayed proceedings pending the appeal that is now before us.

¶ 30                                    II.  ANALYSIS

¶ 31      On appeal, Rush asks us to reverse the friendly-contempt order. Among other things, it argues that it complied with the trial court's order to produce revision data by tendering medical records that included version histories and that, to the extent the trial court ordered it to turn over an audit log that set forth the word-for-word revisions made between versions, the court's order was disproportionate under Illinois Supreme Court Rule 201(c)(3) (eff. July 1, 2014) because Rush's electronic medical record software could not produce a document in that format. Prieto, for her part, urges us to restore the trial court's original sanction.

¶ 32　　In general, we review contempt orders for an abuse of discretion. *In re A.C.*, 2024 IL App (1st) 232052, ¶ 21. However, the correct standard of review ultimately depends on the nature of the question that the trial court answered. *People v. Cole*, 2017 IL 120997, ¶ 19. So, factual findings underlying contempt orders are reviewed under the manifest-weight-of-the-evidence standard, and pure questions of law are reviewed *de novo*. *Id.* Further, review of a contempt finding also necessitates review of any underlying orders that formed the basis for the finding of contempt. *People v. Jones*, 2023 IL App (1st) 221311, ¶ 25. Hence, in an appeal from a contempt finding that is premised on the violation of a discovery order, we may review the propriety of the discovery order. *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). Generally, discovery orders are reviewed for an abuse of discretion. *Id.* at 70. If the underlying discovery order was entered erroneously, then we can vacate a "friendly" finding of contempt. See *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 67.

¶ 33　　　　　　　　　　　　　　A.　Clarifying the Issues on Appeal

¶ 34　　We start by examining how the unusual procedural history underlying this appeal confines and directs our review. In their briefs, the parties discuss at length the trial court's January 18, 2022 order imposing sanctions for discovery violations and its December 29, 2022 order denying Rush's motion to reconsider the original sanctions order. The content of those orders gives essential context for the legal questions before us. But at the same time, this is not an appeal from either of those orders. Indeed, those two orders no longer have any legal effect. At the direction of the supreme court, the trial court vacated the January 18, 2022 sanctions order. A vacated order has the same effect as a void one: none. *7-Eleven, Inc. v. Dar*, 363 Ill. App. 3d 41, 45 (2005); see *Herrera v. Herrera*, 2021 IL App (1st) 200850, ¶ 36 ("A void order is a complete nullity from its inception and has no legal effect."). When the court vacated the original sanctions order, it restored the parties to the position they were in before its entry. *New York Life Insurance Co. v. Sogol*, 311 Ill. App. 3d 156, 158 (1999). That *status quo ante* was a pending decision on Prieto's fully briefed motion for sanctions. Then, upon vacating the original sanctions order, the court immediately held

Rush in "friendly civil contempt" and imposed a purgeable penalty of $50. Effectively, that became the court's ruling on Prieto's motion for sanctions.

¶ 35    That friendly contempt finding, moreover, was fundamentally inconsistent with the original sanctions order. The original sanction—striking Rush's answer and entering judgment against it as to liability—appears to have been meant to punish misconduct. See *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123 (1998) ("An order of dismissal with prejudice or a sanction which results in a default judgment is a drastic sanction to be invoked only in those cases where the party's actions show a deliberate, contumacious or unwarranted disregard of the court's authority."). A friendly contempt finding, by contrast, presupposes that the contemnor's actions were taken in good faith. See *Salvator v. Air & Liquid Systems Corp.*, 2017 IL App (4th) 170173, ¶ 72. When it directed the trial court to find Rush in friendly contempt, the supreme court was implicitly repudiating the findings of bad faith that the original sanction was largely based on. Furthermore, civil contempt is designed to compel compliance with the court's orders, not to punish past misconduct. *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007). Any order of coercive civil contempt is founded upon the contemnor's ongoing refusal to comply with some order of the court. So the question before us is not whether the original sanction was justified or even whether Rush engaged in conduct warranting a punitive sanction—it is whether it was proper for the trial court to find that Rush was still in a state of noncompliance with the court's discovery orders.

¶ 36    In short, because this case comes to us on an interlocutory appeal from an order of friendly contempt, our review is limited to resolving the discovery issues that are still live, not on evaluating the trial court's choice of a punitive sanction (which has been vacated at the supreme court's direction) or analyzing the findings the court made in support of that sanction beyond the fact of continued noncompliance with discovery orders. We will therefore review only whether the finding of friendly contempt is supported by Rush's ongoing refusal to comply with a proper discovery order.

¶ 37                              B.  Rush's Production and the Trial Court's Discovery Orders

¶ 38        A review of the record shows that the trial court found that Rush had, despite its orders, failed to produce the following materials as of the entry of the sanctions order in January 2022 and the order denying reconsideration in December 2022:

- an audit log containing a full revision history;

- the original, unedited version of a three-hour glucose test record;

- a record seen during the live inspection recording a telephone encounter; and

- the electronic records from Cerner, a separate system.

We will evaluate each finding in turn.

¶ 39                                          1.  Revision History

¶ 40        The most hotly contested of the issues before us is Prieto's request for the production of a full history of revisions that have been made to her electronic medical record. She maintains that Rush has not turned over the full data. Rush responds that it has already turned over the data it has and that, in any event, it would be overly burdensome to require it to provide more.

¶ 41        We start by observing that, regardless of what else Rush might be able to produce, it has already disclosed the full revision history for Prieto's medical record in one format. It is undisputed that the electronic medical record produced by Rush contains, when applicable, multiple versions of entries that were changed in some way after being initially recorded in the system. An illustrative example is the operative report describing Anthony's delivery by C-section. The electronic medical record produced to Prieto included three versions of this report. The first was an "unsigned transcription" of the report as dictated by an assisting resident. The second was electronically signed by that same assisting resident, who added two details not included in her original transcribed dictation. The third was electronically signed by the attending surgeon, who made no substantive changes but corrected two formatting errors introduced in the second version. Each version records the date and time it was entered and the identity of the author. The differences

between the versions are not indicated, but they are readily discerned by simply reading each version.

¶ 42　Given that the records produced by Rush contain a version-based history of revisions, one might wonder what more Prieto is seeking. From what we can tell, Prieto's contention is that, based on the experience of her lawyers and her consultant, Rush should be able to create some kind of log that identifies what specific text was added or deleted each time an entry was revised. We understand that such a document would be both relevant and helpful in moving the litigation forward. If such a document existed, it would seem reasonable to require Rush to produce it.

¶ 43　But there is no evidence that the kind of document Prieto wants exists. The trial court assumed that, because it had seen that kind of log in other cases, it was also available in this one. As an initial presumption, that might or might not have been reasonable, but this case has moved well past the stage of initial presumptions. The parties participated in a court-ordered inspection of Rush's live electronic medical record system. That inspection uncovered neither an itemized revisions log nor any kind of application or option that would allow Rush to generate one. Rather, it disclosed that Rush's electronic system showed revisions by allowing users to access and view each distinct version of a given record entry—precisely the same format as the revision history was recorded in the "paper" version of the electronic medical record that Rush produced in 2019. In short, there was and remains no evidence that Rush's system is capable of generating the precise type of word-for-word revision log that Prieto seems to be seeking.

¶ 44　We recognize that, when it entered the later-vacated sanctions order, the trial court thought otherwise. Specifically, it found:

> "While observing a recorded encounter with an OB/GYN, Prieto's expert consultant, Andrew Garrett, pointed out to Narowski and everyone else present where to see the specific revision history in each record, none of which had been produced. ***
>
> While observing options to display revision history for a specific time period, Narowski [*sic*] testified that the difference between types

of revision histories is that one version allows you to see only if changes or revisions have been made and by who, '[w]hereas in revision history, you can see both [the record or note and the revisions] side by side.' " (Bracketed alterations in original.)

These findings cited the transcript from the inspection. But even if the cold transcript suggests that the parties were viewing a previously undisclosed kind of revision history, that reading is quickly dispelled by the video-recording of the inspection, which showed that the revision history the parties found showed each revised version of a particular entry in the same sequence as in the printed record already produced by Rush. Accordingly, the inspection did not show that Rush has or is capable of generating a word-for-word revision log. The trial court's contrary finding was against the manifest weight of the evidence.

¶ 45    Prieto suggests, however, that Rush *should* have this sort of revisions log. She contends that it is required by federal regulations. If that is a correct understanding of the law, and the log should already exist, then it might be entirely reasonable to require Rush to create and then produce one. Hence, we will examine the relevant regulations to determine whether Rush is legally required to maintain a word-for-word revisions log. Interpretations of regulations presents a question of law that we review *de novo*. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16.

¶ 46    The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 29 U.S.C. and 42 U.S.C.), sets national rules for how health information—especially electronic medical records—can be stored, shared, and protected. Among the many regulations that have been adopted to implement HIPAA is the Security Rule. See 45 C.F.R. §§ 164.302 to 164.318. The Security Rule requires entities maintaining covered records to put certain technical safeguards in place, including audit controls: "hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information." 45 C.F.R. § 164.312(b).

¶ 47      At the time of the care in this case, regulations required Rush to maintain audit logs consistently with the ASTM E2147-01 standard (American Society for Testing and Materials International, *Standard Specification for Audit and Disclosure Logs for Use in Health Information Systems*, ASTM E2147-01 (reapproved 2013)). See 45 C.F.R. § 170.210(e). An *audit log*, as defined by ASTM E2147-01, was merely a record of actions taken with respect to data, including additions, deletions, and changes. ASTM E2147-01, § 3.1.2. Audit logs serve several related purposes, but one significant one is to make it possible to look backwards in time to reconstruct what the state of the electronic medical record was at any given point in the past. See *id.* §§ 5.3.2, 5.3.12. So, among other things, the standard required audit logs to reflect the kind of action taken, including "any changes made (with pointer to original data state), and a delete specification (with a pointer to deleted information). *Id.* § 7.6. Prieto argues that Rush did not produce a log with the necessary "pointer." We note that "pointer" is not defined by the standard or in any of the regulations that the parties have brought to our attention. Prieto does, however, cite guidance found on the website for the Assistant Secretary for Technology Policy explaining that a pointer as some "means of identifying" the "original information that has been changed by a user" or the "information prior to deletion." U.S. Dep't of Health & Hum. Servs., Off. of the Nat'l Coordinator for Health Info. Tech., *Auditable Events and Tamper-Resistance Test Method*, HealthIT.gov, https://www.healthit.gov/test-method/auditable-events-and-tamper-resistance (last updated March 11, 2024). The guidance notes that there is no set way to accomplish this, but it specifically provides that "the ability to view the original document prior to a change or deletion is an acceptable method of meeting the certification requirement." In other words, it is adequate to maintain both the "before" and "after" versions of each record entry that is modified—and that, of course, is precisely what Rush produced to Prieto in 2019. The versions *are* the audit log. Prieto has had Rush's audit log since 2019. Contrary to Prieto's argument, Rush was not required by law to maintain that same audit data in her preferred format.

¶ 48      Because Rush is not required to maintain the kind of word-for-word revision history that Prieto evidently seeks, there is not a reasonable basis for demanding it to prepare one itself from

scratch. The revision data has already been disclosed on the face of the records themselves, so whatever convenience might be added by having a word-for-word revision log is plainly outweighed by the burden that it would put on Rush to create one from scratch. See Ill. S. Ct. R. 201(c)(3) (eff. July 1, 2014). To the extent the trial court ordered Rush to produce one anyway, it abused its discretion.

¶ 49                                        2. Results of Glucose Testing

¶ 50        In the original sanctions order, the trial court found that, during the live inspection, "[t]he parties observed records related to glucose tolerance testing that had not been produced." The transcript of the inspection shows that, upon viewing the test results, counsel for plaintiff asserted that they had not been previously produced. The record on appeal, however, includes a copy of the medical records Rush produced on July 25, 2019, and they include the results of the three-hour glucose-tolerance test performed on December 20, 2013. That contradicts the trial court's finding that Rush failed to produce them.

¶ 51        When Rush pointed out that oversight in its motion to reconsider the sanctions order, however, the trial court noted that the test records bear the notation "Edited Result," which the trial court construed to mean that Rush had failed to produce the "corresponding audit data that shows the previous, *original* results of these tests." (Emphasis in original.) A close examination of the test record itself, though, shows that it includes *four* sets of results, not one. The first set only included Prieto's baseline glucose level at the start of the three-hour test. That set is notated as being a "Final result." The second set of results included both the baseline and the glucose level measured at the one-hour mark. That set is marked "Edited Result - FINAL." The third set added the glucose level measured after two hours, and the fourth entry added the level measured at the end of the three-hour test. Like the second set, the third and fourth sets are marked "Edited Result - FINAL." The only reasonable interpretation of this record is that the four test results were input sequentially, which is why the second, third, and fourth sets of results are noted as having been edited. The "original" result, in other words, was the first set that recorded Prieto's glucose level at the start of

the test. Because that original result is shown on the face of the medical record, we agree with Rush that the trial court erred by finding that Rush had not produced it.

¶ 52                                    3.  Telephone Encounter

¶ 53      The trial court found that, during the live inspection, "[t]he parties observed records related to a telephone encounter that had not been produced." That finding rested on the following exchange:

> "Q.  Can you please look for a telephone encounter dated March 19th, 2014?
>
> A.  What's the—what's the date?
>
> Q.  March 14th [*sic*], 2014.
>
> [COUNSEL FOR PLAINTIFF]:  Wait.
>
> [LEAD COUNSEL FOR PLAINTIFF]:
>
> Q.  Take a screenshot of that entire encounter, please. Can you call it—can you click on that?
>
> A.  Sure.
>
> [LEAD COUNSEL FOR PLAINTIFF]: We've never seen this, right?"

The record entries that are viewable on screen during this exchange were actually those for a routine prenatal visit, not a telephone call, on March 14, 2014. Those same entries were included with Rush's production of Prieto's medical records. They were produced, and the court was mistaken when it found that they had not been.

¶ 54                                    4.  Cerner Records

¶ 55      Finally, in its order denying Rush's motion to reconsider, the trial court found that Rush violated the discovery rules by not producing the records related to Prieto found in its Cerner system. On appeal, Rush contends that its failure to produce any Cerner records does not merit sanctions because Prieto did not raise that issue at any Rule 201(k) conferences or in a motion to

compel production. This gets it exactly backwards: if Rush believed that the Cerner records were not discoverable, then the onus was on *it* to take action by asserting some valid ground for refusing to produce those records in a manner contemplated by the rules. See, *e.g.*, Ill. S. Ct. R. 201(c)(1), (k), (n) (eff. July 1, 2014); Ill. S. Ct. R. 214(c) (eff. July 1, 2018). Rush does not dispute that, in January 2019, Prieto asked it to produce *all* medical records, not just records from the Epic system. Rush does not dispute that the Cerner records were encompassed by that request. And Rush does not dispute that it did not produce those records even though they were responsive to the request. As far as we can tell, Rush has never taken the position that Prieto is not entitled to her records from the Cerner system, specifically. In fact, in its brief, Rush avers that, upon remand, it will produce any Cerner records that may exist—an implicit concession that the Cerner records are, in fact, discoverable.

¶ 56    A party that neither produces responsive material nor objects to its production is, in effect, saying that there is no material to produce. *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 282 (1982). Rush's view seems to be that it is entitled to silently withhold responsive documentation—to act as though it does not exist—unless and until the opposing party manages to see through the ruse. It should go without saying, but discovery is not a game. It is "a mechanism for the ascertainment of truth, for the purpose of promoting either a fair settlement or a fair trial." *Id.* Between Rush's apparent concession that Prieto is entitled to the Cerner records and the uncontested fact that Rush did not produce those records, the trial court's finding that Rush violated the discovery rules by not producing the Cerner records was beyond reasonable.

¶ 57    Nevertheless, it does not follow that Rush's disregard of its discovery obligations justifies a finding of contempt at this juncture. The issue with the Cerner records was first raised in Prieto's response to Rush's motion to reconsider the sanctions order. Rush has consistently represented that it stands ready to produce those documents once discovery is open again. We trust that, on remand, Rush will follow through on that commitment. If it fails to do so, the trial court will undoubtedly take whatever steps it determines are appropriate in light of the discovery rules and the court's own inherent authority.

¶ 58                                    C.  Disposition

¶ 59        To summarize, we hold that the record demonstrates that Rush produced the revision data, which was disclosed on the face of the medical records and that Rush's productions did not omit a telephone encounter or an unedited glucose test result. Additionally, we find that, because the issue involving the Cerner records was not raised until after the court entered its sanctions order, it does not provide a basis for affirming the contempt order at this juncture. Hence, we vacate the friendly contempt order and remand for further proceedings.

¶ 60        We think it is important to clarify what we are *not* holding, however. Because the trial court's original sanction is not before us, we have not considered whether that sanction was legally justified, nor have we examined whether the trial court's detailed findings about Rush's conduct during the discovery process were supported by the record. We express no view as to whether the trial court should proceed as to those matters on remand or what sanctions, if any, might be justified. We hold only that the record does not disclose a basis for finding that Rush has failed to comply with court orders directing it to produce a full revision history or the two specific records discussed above.

¶ 61                                  III.  CONCLUSION

¶ 62        We hold that the trial court's findings that Rush had failed to produce the audit data within its possession, the original glucose test results, and the record from the March 14, 2013 in-office visit were against the manifest weight of the evidence. We also hold that the trial court reasonably found that Rush had violated its discovery obligations by failing to disclose the Cerner records, but we further hold that this conduct did not amount to contempt of court. We express no view as to the other conduct addressed in the now-vacated sanctions order.

¶ 63        Accordingly, we vacate the finding of contempt and the imposition of a penalty thereon, and we remand the cause for further proceedings.

¶ 64        Order vacated and cause remanded.