2026 IL App (2d) 240561-U
No. 2-24-0561
Order filed March 19, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. CHRISTOPHER VAZQUEZ, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable James K. Booras and David Christopher Lombardo, Judges, Presiding.
No. 21-CF-1007

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court did not err in denying defendant's motion to suppress evidence where the *Terry* stop and frisk of defendant's person was supported by reasonable articulable suspicion; (2) aggravated unlawful use of a weapon statute was not facially unconstitutional; and (3) defendant abandoned argument that aggravated unlawful use of a weapon statute was unconstitutional as applied.

¶ 2     Following a jury trial in the circuit court of Lake County, defendant, Christopher Vazquez, was convicted of two counts of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5), (a)(3)(C) (West 2020)) and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1 (West 2020)). The aggravated-unlawful-use-of-a-weapon convictions were based on defendant not having a currently valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et* seq. (West 2020)) and defendant not having a currently valid Firearm Owner's

Identification (FOID) card. The trial court sentenced defendant to six years' imprisonment for the conviction of aggravated unlawful use of a weapon based on defendant not having a currently valid FOID card (720 ILCS 5/24-1.6(a)(1), (3)(C) (West 2020)), with the other two counts merging. On appeal, defendant raises two issues. First, he argues that the trial court erred in denying his pre-trial motion to suppress evidence because he was seized without either probable cause or reasonable articulable suspicion. Second, he argues that the aggravated unlawful use of a weapon statute violates the second amendment to the United States Constitution (U.S. Const., amend. II) both on its face and as applied to him under the test set forth in the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). We disagree with both contentions and therefore affirm.

¶ 3                                          I. BACKGROUND

¶ 4      On July 17, 2021, defendant was charged by complaint with various offenses stemming from an encounter between him and police at A.J.'s Bar in Round Lake Park. On August 10, 2021, the State filed a four-count superseding information. Count I charged defendant with escape (720 ILCS 5/31-6(c) (West 2020)). Count II charged defendant with aggravated unlawful use of a weapon based on defendant not having a currently valid license under the Firearm Concealed Carry Act (720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2020)). Count III charged defendant with aggravated unlawful use of a weapon based on defendant not having a currently valid FOID card (720 ILCS 5/24-1.6(a)(1), (3)(C) (West 2020)). Count IV charged defendant with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1 (West 2020)).

¶ 5      On May 11, 2022, defendant filed a motion to suppress evidence. The motion asserted that defendant's arrest was unlawful under the fourth and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, XIV) because it lacked probable cause. The motion also

asserted that the officers lacked reasonable suspicion to conduct a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)) and, regardless, the actions of the officers did not conform with the limitations on a *Terry*-style investigative stop and search.

¶ 6 On June 3, 2022, the trial court held a hearing on the motion to suppress. At the hearing, the State "accept[ed] the burden" and called Officer Waymon Vela of the Round Lake Park Police Department. Vela testified that he received a dispatch from CenCom at around 1:45 a.m. on July 17, 2021, about a man threatening patrons at A.J.'s Bar. Specifically, dispatch advised that there was a "male Hispanic *** wearing a black cap, wearing all black [who] had threatened patrons with a gun."[1] Vela could not recall if dispatch said the suspect pointed a gun at anybody. After Vela stated that his recollection had been exhausted regarding the information he received from dispatch, he was allowed to read his report from the night of the offense. After reading the report, Vela testified that dispatch "stated that *** the male subject had pointed the gun at the *** unknown patron."

¶ 7 Vela testified that when he got the call from dispatch, he was just a few blocks from A.J.'s Bar. Vela, who was the first officer to arrive at the bar, was in his full uniform and had a firearm. Noting the bar's parking lot was "heavier than normal," Vela asked for additional units to respond. Eventually, Sergeant Robert Robinson and Officer Patrick McWard from the Round Lake Police Department arrived.[2] Vela testified that the three officers encountered William Baczek, the owner of the bar, outside the establishment. Vela stated that Baczek gave "the same description that

---

[1]Although the call to dispatch was recorded, the audio of that call is not included in the record on appeal because it was not preserved.

[2] Officer McWard is also referred to as "Officer Ward" in the record. For consistency, we will refer to him as Officer McWard or McWard.

dispatch gave us." Vela also believed that Baczek said that the suspect had "threatened some patrons with a gun." Baczek then "pointed to his wristband [*sic*]," which Vela understood to mean that the suspect had a gun in his waistband. Vela noted that it is illegal to have a firearm in a bar.

¶ 8      Baczek, Vela, and the two other officers then entered the bar. Vela testified that the bar was crowded and loud music was playing. Baczek directed the officers to Tracey Gentile (a patron and former employee of A.J.'s Bar). Gentile indicated that she would point out where the suspect was last seen. Vela and the other officers followed Gentile towards a door at the rear of A.J.'s Bar which was the only way to get to the back patio. Vela then explained:

> "[Gentile] opens the door and she steps out and there is a landing there that walks down to the patio. So we were bumped into some people [*sic*], and I believe I actually bumped into the subject that we were looking for. And just passed him just a little bit. And [Gentile] turned around and starts pointing, 'That's him, that's him.' "

Vela testified that after Gentile pointed at defendant, defendant "turn[ed] around right away and it appear[ed] he was going to run from me. It actually looked like he was reaching toward his right waistband." Vela stated that, at that point he believed defendant had a weapon on him because of "all the information [he] got from dispatch and from Mr. Baczek." In particular, Vela noted that the description of the suspect provided by dispatch matched defendant, Gentile pointed out defendant, and defendant reached toward his right side, consistent with what Baczek showed him. Vela reached for defendant's right wrist because he was concerned defendant would compromise the safety of the officers and patrons by "going to grab something that he wasn't supposed to grab." Vela testified that defendant tried to pull away from him and moved towards the door. Vela instructed defendant to stop. Vela kept his grip and the other two officers helped to place defendant under control. Vela told defendant not to move in Spanish and in English. At one point, Vela asked

defendant if he had a gun. Defendant initially responded "I do," but later denied he had a weapon. Vela then told defendant he was going to direct him to the floor. A fourth officer, Nicholas Bowman, arrived. The officers eventually subdued defendant. Officer Bowman patted defendant down and recovered a firearm from defendant's person.

¶ 9    The State introduced video footage of the interaction from Vela's body-worn camera. The video shows Vela as he approaches A.J.'s Bar. Baczek tells the officers that the suspect is in the back, but that area cannot be accessed from outside the bar. Baczek states that the suspect is "wearing all black, he's got a hat, is Hispanic, and has curly hair." Baczek further states that the suspect had "only been verbal, [but] he showed somebody" while making a brief gesture toward his right hip. The video also shows Gentile gesturing to Vela to follow her through the bar towards the back patio. Vela bumped into some patrons as he followed Gentile out the back door. Vela eventually made it out the back door, walked up behind a person, tapped him on the shoulder, and said, "excuse me," appearing to try to get past him. At that point, Gentile had walked past defendant and turned back, facing both defendant and Vela. The scene becomes chaotic and the video goes mostly dark. However, audio reflects someone yelling, "Don't move! Don't fuckin' move!" The audio then suggests commotion. Defendant is asked if he has a gun. He initially responds, "I do" (although this is disputed by the defense). Shortly later, defendant repeatedly denies having a gun. More than once the officers are heard telling defendant to stop resisting. The video also shows Bowman emerging with a firearm after defendant had been handcuffed.

¶ 10    On cross-examination, defense counsel asked Vela to point out where in the report he reviewed on direct examination it states that dispatch said that the suspect pointed a gun at someone. Vela responded, "It's not there." He later explained that the report is a "summary of the circumstances of the event," but from what he could recollect, dispatch stated that "people saw

[defendant] pointing the gun at other patrons." In addition, excerpts from the body-worn video were published in which Vela and Bowman are talking at the police station after defendant had been arrested. In the clip, Vela says that Gentile and Baczek "did not see any guns," but that defendant "was making accusations" that he had a gun, and Gentile and Baczek wanted him off the property. Also on cross-examination, Vela stated that when Gentile pointed to defendant, "[h]e [(defendant)] walked toward me," but also stated that defendant "made that motion to walk away from me right away, ran away *** turned around, ran toward the door." When asked if Vela saw any illegal activity, he responded, "At that moment, I had more than enough reasonable suspicion to believe that [defendant] had the gun because of the way—his demeanor was when he looked at [Gentile when she identified him]" coupled with the information he had from dispatch, Baczek, and Gentile.

¶ 11    Sergeant Robinson of the Round Lake Police Department testified that he was on duty and in uniform on July 17, 2021, at 1:45 a.m., when he received a dispatch. The dispatch advised that "a male Hispanic subject with black curly hair wearing all black clothing and a black hat flashed a gun to one of the subjects inside" A.J.'s Bar. Robinson testified that the Round Lake Park Police Department had responded to the incident, but he and Officer McWard also came to the scene due to a request for assistance and the nature of the call. On cross-examination, Robinson testified that Baczek was the complainant on the 911 call. Robinson did not personally hear the 911 call. Robinson acknowledged that Baczek did not tell him that he saw a gun. Robinson also acknowledged that he never saw a gun and that he did not observe defendant violate any law before he was placed under arrest.

¶ 12    After hearing arguments, the trial court denied the motion to suppress. The trial court found that the information from dispatch that there was a man with a gun at the bar, Baczek's indication

at his right hip and comment that the suspect showed somebody a gun, Gentile leading Vela to defendant, and defendant matching the description provided to dispatch was sufficient to establish reasonable articulable suspicion. The court reasoned that when Vela approached defendant, he had reasonable suspicion that defendant "may be packing a gun" and that defendant "would put in jeopardy the officers' safety *** and patrons if bullets were to be flying." Additionally, the trial court determined that defendant made "furtive actions" and indicated that he "was going to bolt basically, to leave, to go towards the exit." The trial court also stated that Vela and the other officers told defendant to stop and not to move "[a]nd then [Vela,] for [the] officers' safety grabbed [defendant's] right arm when the defendant is about to move or do something and not submit to the reasonable commands that the officer gave him."

¶ 13    The court further noted that when asked if he had a gun, defendant initially responded that he did before changing his story. The court found that defendant "kept on fighting" and that Vela had to use reasonable force because defendant was resisting. A subsequent search of defendant revealed a firearm. The trial court also found that defendant was not under arrest until after the firearm was discovered. The court stated that, under the circumstances, the "stop and attempt to frisk even though it was resisted by the defendant was reasonable under the circumstances [and] qualifies as a *Terry* stop."

¶ 14    On July 1, 2022, defense counsel filed a motion to reconsider the denial of the motion to suppress, which the trial court denied after hearing arguments. On May 23, 2023, defense counsel filed a "Motion to Revisit" the motion to suppress. In a memorandum in support of that motion, trial counsel discussed written statements from Baczek and Gentile, which were not tendered by the State before either of the prior hearings. In his written statement, Baczek disclosed that he received "several statements from customers regarding a customer that might be carrying a gun."

Baczek further wrote in his statement that he was told by a customer that "a Hispanic male dressed in all black wearing a black ball cap was bragging about and flashing a firearm." Baczek also indicated that he called the "non-emergency" police number to relay this information. In her written statement, Gentile stated that defendant "was pulling the corner of his shirt up to show the gun in his wasteband [*sic*] to customers." Gentile further wrote that as she escorted the police to the back patio, defendant "was trying to sneak inside past the cops through the sliding door." Gentile pointed out defendant to the police and defendant "immediately started fighting with them" and the police "said [defendant is] reaching for his gun." The State admitted that the written statements were not disclosed prior to earlier arguments on the motion to suppress. The trial court denied the motion.

¶ 15 Following jury selection, defendant's trial began on July 8, 2024. Prior to trial, the State, without objection, filed amended versions of the aggravated-unlawful-use-of-a-weapon counts (counts II and III). The State also nolle prossed the pending charge for escape (count I). Defense counsel moved for the gun counts to be dismissed based on the United States Supreme Court's decision in *Bruen*, 597 U.S. 1. The trial court denied defense counsel's motion.

¶ 16 The evidence presented by the State at trial was largely consistent with what it presented at the hearing on the motion to suppress. Vela testified about his role in the encounter with defendant and portions of his body-worn camera footage were published for the jury. In addition, Bowman testified that he was dispatched to A.J.'s Bar at about 1:45 a.m. on July 17, 2021. When Bowman arrived, he heard a commotion towards the back of the bar. Bowman observed several officers trying to restrain defendant because defendant refused to place his hands behind his back. After defendant was handcuffed, Bowman searched defendant and recovered a firearm from the right front side of defendant's waistband. A portion of Bowman's body-worn camera footage was

published for the jury. Through Bowman, the State also introduced the firearm and ammunition recovered from the weapon on the night of defendant's arrest. In addition, the State introduced and published a stipulation that defendant had a qualifying prior felony in his record to satisfy that element of unlawful possession of a weapon by a felon. Finally, the State introduced abstracts as evidence that defendant did not have a valid concealed carry license or FOID card at the time of his arrest.

¶ 17    At the close of the State's case, defense counsel renewed the motion to suppress, which the court denied. Defense counsel then made a motion for a directed verdict, which was also denied. Defendant did not call any witnesses or present any evidence. After closing arguments, the jury was instructed and began their deliberations. The jury returned guilty verdicts on all three counts.

¶ 18    On August 5, 2024, defense counsel filed a motion for judgment notwithstanding the verdict. Among other things, defense counsel argued that the court erred in denying the motion to suppress and for failing to reopen proofs regarding the motion to suppress after new discovery was tendered by the State. Defense counsel also contended that the trial court erred in denying the motion to dismiss the firearm counts based on *Bruen*, 597 U.S. 1. On September 13, 2024, after hearing arguments from both sides, the trial court denied the motion.

¶ 19    Also on September 13, 2024, the court held a sentencing hearing. The trial court determined that the unlawful-possession-of-a-weapon-by-a-felon conviction would merge into the aggravated-unlawful-use-of-a-weapon convictions because the latter were the "more serious" offenses and that defendant would be sentenced on one of the aggravated-unlawful-use-of-a-weapon counts. The State asked that defendant be sentenced to the maximum sentence of seven years' imprisonment based on his criminal history and the fact that he was on bond for another offense when the instant offenses were committed. Defense counsel argued that the maximum sentence was excessive and

that five years' imprisonment would be more appropriate. Defendant did not offer any evidence in mitigation, and he declined to make a statement in allocution. Considering defendant's criminal history and his adverse reaction to authority, the trial court sentenced defendant to six years' imprisonment, with one year of mandatory supervised release. Defendant received credit for 1,155 days. The court admonished defendant regarding his appellate rights and defense counsel asked that a notice of appeal be filed. The court confirmed that defendant wished to proceed directly to an appeal and did not want to challenge his sentence. This appeal ensued.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, defendant raises two principal issues. First, he argues that the trial court erred in denying his pre-trial motion to suppress because he was seized without either probable cause or reasonable articulable suspicion. Second, he argues that the aggravated unlawful use of a weapon statute is unconstitutional facially and as applied to him. We address each argument *seriatim*.

¶ 22                               A. Motion to Suppress

¶ 23    Defendant argues that the trial court erred in denying his pretrial motion to suppress. Defendant contends that the officers' conduct constituted a seizure, that the seizure amounted to an arrest, and that the officers lacked probable cause. Defendant asserts that because the arrest was not supported by probable cause, any contraband found in the ensuing search must be suppressed. Defendant disputes the trial court's finding that the encounter between him and the police constituted a *Terry* stop (see *Terry*, 392 U.S. 1) because he was not merely detained for an investigatory stop but was taken to the ground and put into handcuffs before any illegal activity was reasonably suspected. However, even if the seizure is found to be a *Terry* stop, defendant maintains that the police lacked reasonable articulable suspicion to initiate such an encounter. As such, defendant contends that the encounter violated his fourth amendment rights. Defendant asks

- 10 -

this court to reverse the trial court's ruling denying his motion to suppress and reverse his convictions outright.

¶ 24    The State responds that the trial court properly denied defendant's motion to suppress. The State maintains that a *Terry* stop was justified because the encounter was supported by reasonable, articulable suspicion that defendant was armed and dangerous. In support of its position, the State cites the nature of the call to dispatch, information from people at the scene, and defendant's conduct during his interaction with police—which included defendant making furtive movements towards the gun and attempting to flee. The State asserts that once defendant was frisked, the firearm at issue was lawfully discovered and seized. Thus, the State reasons, the *Terry* stop and frisk were lawful and the subsequent arrest was proper.

¶ 25    In reviewing a trial court's ruling on a motion to suppress, we employ a two-part standard. *People v. Tennort*, 2023 IL App (2d) 220313, ¶ 15. Under this standard, we defer to the trial court's findings of fact and credibility determinations and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Mora*, 2023 IL App (2d) 210653, ¶ 40. Such findings are against the manifest weight of the evidence only when an opposite conclusion is clearly evident from the record or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Pursley*, 2022 IL App (2d) 210558, ¶ 60. However, we review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *People v. Almond*, 2015 IL 113817, ¶ 55. Moreover, in reviewing a ruling on a pretrial motion to suppress, a court may rely on evidence presented at a defendant's trial as well as the evidence presented at the suppression hearing. *Almond*, 2015 IL 113817, ¶ 55.

¶ 26    Both the Illinois Constitution (Ill. Const. 1970, art. I, § 6) and the fourth amendment of the United States Constitution (U.S. Const., amend. IV) guarantee the right of individuals to be free

from unreasonable searches and seizures. *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 24; *People v. Ewing*, 377 Ill. App. 3d 585, 590 (2007). Our supreme court has explained that "[t]he essential purpose of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 31; see also *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (observing that "the ultimate touchstone of the Fourth Amendment is 'reasonableness' "). Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *People v. Wilson*, 228 Ill. 2d 35, 40 (2008).

¶ 27    Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). However, in *Terry*, the United States Supreme Court held that the public interest in effective law enforcement makes it reasonable in some situations for law enforcement officers to temporarily detain and question individuals even if probable cause for an arrest is lacking. *Terry*, 392 U.S. at 21-22; *People v. Linley*, 388 Ill. App. 3d 747, 749 (2009). *Terry* authorizes a police officer to conduct a limited investigatory stop where there exists a reasonable suspicion that the person detained is committing, has committed, or is about to commit a crime. *Terry*, 392 U.S. at 21-22; see also *Colyar*, 2013 IL 111835, ¶ 32 (noting that under *Terry*, "a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous" (citing *Terry*, 392 U.S. at 30.)); *People v. Williams*, 2016 IL App (1st) 132615, ¶ 44. Moreover, where there are concerns for the safety of law enforcement or the public, a police officer may handcuff the detainee for the brief duration of the investigatory stop. *People v. Arnold*, 394 Ill.

App. 3d 63, 71 (2009); see also *Colyar*, 2013 IL 111835, ¶ 46 (stating that handcuffing does not automatically transform a *Terry* stop into an illegal arrest). The officer's reasonable suspicion must be more than a hunch and must be supported by specific and articulable facts. *Terry*, 392 U.S. at 27; *In re J.J.*, 183 Ill. App. 3d 381, 385-86 (1989). When reviewing the officer's action, a court will apply an objective standard, rather than a subjective one. *Colyar*, 2013 IL 111835, ¶ 40. Thus, the question on review is whether the facts known to the officer at the time of the encounter would lead a reasonably prudent person in the same circumstances to believe that he or she is dealing with an armed and dangerous individual. *Colyar*, 2013 IL 111835, ¶ 40; *Linley*, 388 Ill. App. 3d at 749.

¶ 28    We further observe that a *Terry* stop may be initiated based on facts not personally known to the officer conducting the stop. *Linley*, 388 Ill. App. 3d at 750. For instance, "[u]nder the 'collective- or imputed-knowledge' doctrine, information known to all of the police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion to justify a *Terry* stop." *Ewing*, 377 Ill. App. 3d at 593. A tip from a member of the public may also suffice if, in view of the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge, there are some indicia of the tip's reliability. *Linley*, 388 Ill. App. 3d at 750; see also *People v. Shafer*, 372 Ill. App. 3d 1044, 1049 (2007) (noting that an informant tip received by telephone may form the basis of a *Terry* stop if the tip is reliable and allows the officer to reasonably infer that a person was involved in criminal activity). In evaluating the reliability of a tip, a court considers various factors, including: (1) whether the tip provides a sufficient quantity of information so that the officer may be certain that the stopped individual is the one the tipster identified; (2) the time interval between the officer receiving the tip and locating the suspect; (3) whether the tip is based upon contemporaneous eyewitness observations; (4)

whether the tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed a crime; and (5) whether the tip was made to a police emergency number. *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 30. Additionally, a tip providing predictive information and readily observable details will be deemed more reliable if these details are confirmed or corroborated by the police. *People v. Allen*, 409 Ill. App. 3d 1058, 1072 (2011).

¶ 29    The record in this case shows that officers responded to a dispatch reporting that a Hispanic male dressed in black and wearing a black cap had threatened patrons at a bar with a gun. Vela knew that it is illegal to have a firearm in a bar. Once backup arrived, Vela and his fellow officers approached the establishment where they met Baczek, the owner of the bar. Baczek gave a description of the subject that matched the one provided by dispatch. Baczek also told the officers that the suspect "had only been verbal, [but] he showed somebody" while making a brief gesture toward his right hip. Vela interpreted Baczek's gesture to mean that the suspect had a gun in his waistband. Vela and the other responding officers entered the bar, where Gentile escorted them to the back patio. Gentile, Vela, and the other officers walked through the back door and onto a landing where Vela believed defendant to have passed him. Gentile then turned around and identified defendant as the suspect. At that point, according to Vela, it appeared as if defendant was going to run and as if he was reaching for his right waistband. Vela took defendant's right wrist because he was concerned defendant would compromise the safety of officers and patrons. However, defendant started pulling away and moving towards the door. After Vela instructed defendant not to move, Sergeant Robinson and Officer McWard helped to restrain defendant. During the encounter, defendant initially admitted to having a gun, before denying it. A subsequent pat down of defendant revealed a firearm.

¶ 30    On this record, the trial court found that dispatch informed the officers that there was a man with a gun at the bar, Baczek indicated that the suspect showed somebody the gun and Baczek gestured to his right hip, and Gentile lead the officers to defendant, who matched the description of the suspect provided to dispatch. The court additionally determined that defendant made "furtive actions" and that he "was going to bolt basically, to leave, to go towards the exit." In response, and for safety reasons, Vela told defendant not to move and grabbed defendant's right arm. The court noted that during the encounter, defendant is asked if he has a gun, initially responding in the affirmative before denying that he had a firearm. The court ultimately concluded that, under the circumstances, "defendant's stop and attempt to frisk even though it was resisted by the defendant was reasonable under the circumstances [and] qualifies as a *Terry* stop."

¶ 31    Based on the totality of the circumstances, we conclude that the trial court properly determined that the encounter at issue constituted a *Terry* stop and that the *Terry* stop was lawful. Here, the tip at issue was reliable not just in its tendency to identify a determinate person, but also in its assertion of illegality. See *Florida v. J.L.*, 529 U.S. 266, 272 (2000) (citing 4 W. LaFave, Search and Seizure, § 9.4(h), p. 213 (3d ed. 1996)). At the hearing on the motion to suppress, both Vela and Sergeant Robinson testified that a Hispanic man wearing all black clothing and a black hat had flashed or threatened patrons at the bar with a gun. While possession of a firearm is not necessarily a crime, and the officers were unaware of defendant's status as a felon or whether he possessed a valid FOID card or a concealed carry license, Vela noted that it is illegal to have a firearm in a bar. See 720 ILCS 5/24-1(a)(8) (West 2020) (making it unlawful to carry or possess a firearm in any place which is licensed to sell intoxicating beverages); 430 ILCS 66/65(9) (West 2020) (prohibiting a licensee under the Concealed Carry Act from knowingly carrying a firearm on or into any building under the control of an establishment that serves alcohol on its premises).

- 15 -

When the officers approached Baczek outside of the bar, he told them that the suspect "had only been verbal, [but] he showed somebody" while making a brief gesture toward his right hip. Gentile guided the officers to the bar's back patio and identified defendant as the subject. The officers were in full uniform, so patrons of the bar were aware of their office. At that point, Vela observed defendant reach towards his right waistband (which was consistent with what Baczek showed Vela) and attempted to run from Vela. Vela, concerned that defendant's conduct posed a safety concern to the officers and the patrons at the crowded bar, attempted to restrain defendant. See *Terry*, 392 U.S. at 27 (providing that "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, were he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime"). Thus, as the trial court correctly determined, the decision to detain defendant resulted from the nature of the call to dispatch, information from people at the scene, and defendant's conduct during his interaction with police—which, as noted above, included defendant making furtive movements towards the gun and attempting to flee the scene. Following these events, but during the encounter, Vela asked defendant if he had a gun. Although disputed by defendant, the record supports the trial court's finding that defendant initially responded in the affirmative before later denying he had a weapon. Based on this record, we cannot say that the trial court's factual determinations were against the manifest weight of the evidence. Further, the court did not err in finding that the officers' actions were reasonable given the facts known to them at the relevant time.

¶ 32    In reaching this conclusion, we observe that the reliability of the tip that resulted in the officers' dispatch was just one of several factors that, viewed from the perspective of a reasonable officer, made the *Terry* stop valid. See *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 24

(holding that the reliability of the tip that resulted in the officers' dispatch was not dispositive of the validity of the *Terry* stop, but just one of several factors that made the stop valid). Notably, dispatch's description of the suspect matched defendant, the suspect was accused of possessing a firearm in a bar, and defendant engaged in a furtive movement and attempted to flee when Gentile identified him.

¶ 33    Regardless, considering the factors applied in assessing the reliability of a tip, we conclude that the tip at issue had sufficient indicia of reliability. First, the tipster provided a description that matched defendant's appearance. Second, while the record does not clearly state the time interval between the officer receiving the tip and locating defendant, Vela testified that when he received the dispatch he was just a few blocks from A.J.'s Bar. Upon his arrival, Vela waited for backup before entering. The central events of this matter occurred shortly thereafter. From this record, one can reasonably infer that a significant amount of time did not elapse between the time the officers received the tip and they located defendant. Third, at the time of the encounter Baczek purported to have personal knowledge of defendant's behavior and corroborated information from dispatch. See *People v. Holmes*, 2019 IL App (1st) 160987, ¶ 20 (citing *People v. Thomas*, 198 Ill. 2d 103, 109 (2001)) (noting that the reasonableness of a *Terry* stop is based on the facts known to the officer at the moment the stop occurred). Finally, we note that the record is conflicting whether the tip in this case was made to a police emergency number or a non-emergency number. We note, however, that the rationale that a call made to an emergency number is considered reliable is because such a caller is likely aware that, because the authorities often record emergency calls and have the means to instantly determine the telephone number from which the call was made, they may be able to determine the caller's identity. *Linley*, 388 Ill. App. 3d at 750; see also *People v. Martin*, 2020 IL App (2d) 180910-U, ¶ 28 (noting that while a call to an emergency number does

not make the call *per se* reliable, it is relevant in a favorable sense in assessing the overall reliability of the caller). Here, irrespective of whether the tip was made to an emergency or non-emergency number, the police eventually learned that Baczek was the person who phoned in the tip. Thus, the identity of the caller was known.

¶ 34    Defendant argues that the officers did not have and they did not speak to anyone with personal knowledge of illegal activity committed by him. Defendant relies on *Florida v. J.L.*, 529 U.S. 266 (2000), and *Holmes*, 2019 IL App (1st) 160987. We find both cases distinguishable.

¶ 35    In *J.L.*, police officers received an anonymous call indicating that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268. Officers arrived at the bus stop and observed three black males, including the defendant, who was wearing a plaid shirt. *J.L.*, 529 U.S. at 268. The officers did not see the defendant do anything illegal, they did not see a firearm, and the defendant made no threatening or otherwise unusual movements. *J.L.*, 529 U.S. at 268. One of the officers, based solely upon the anonymous tip, searched the defendant and recovered a gun. *J.L.*, 529 U.S. at 268. The Supreme Court determined that the anonymous tip did not contain the required indicia of reliability, and thus, the *Terry* stop and frisk was unjustified. *J.L.*, 529 U.S. at 269-74. The Supreme Court noted that the officers' suspicion that the defendant was carrying a weapon "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." *J.L.*, 529 U.S. 270. Because "[a]ll the police had to go on *** was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]," the Supreme Court concluded the search was unlawful. *J.L.*, 529 U.S. at 271. The Supreme Court acknowledged that the police had "[a]n accurate description of the subject's readily observable location and appearance," but stated that

the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

¶ 36    In this case, the tip at issue did not simply claim that an identifiable person was in possession of a firearm. Rather, there was an assertion of suspected illegality in the call that was not present in *J.L.* Vela and Robinson testified that, according to dispatch, the caller stated that the person had flashed a gun or threatened patrons at the bar with a gun. Vela further noted that it is illegal to have a firearm in a bar. See 720 ILCS 5/24-1(a)(8) (West 2020) (making it unlawful to carry or possess a firearm in any place which is licensed to sell intoxicating beverages); see also 430 ILCS 66/65(9) (West 2020) (prohibiting a licensee under the Concealed Carry Act from knowingly carrying a firearm on or into any building under the control of an establishment that serves alcohol on its premises). In contrast, the caller in *J.L.* merely stated the person at the bus stop was in possession of a gun. There was no report of conduct that suggested illegal activity. We further note that, unlike in *J.L.*, Vela observed conduct that led him to believe that defendant was concealing a firearm under his clothes. *Cf. J.L.*, 529 U.S. at 270 ("In the instant case, the officers' suspicion that [the defendant] was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller.").

¶ 37    Defendant points out that at the time of the encounter with him, the original source of the tip was unknown to the police. While true, we observe that, before encountering defendant, the police spoke with Baczek (who was later identified as the individual who called the police). Baczek corroborated the description provided by dispatch and also provided information as to where the gun was located on defendant's person. Moreover, as discussed above, the fact that the informant was later identified distinguishes this case from *J.L.*, where there was nothing known about the informant. See *J.L.*, 529 U.S. at 268.

¶ 38    In *Holmes*, the tip came from an unidentified security guard who informed a police sergeant that a man "described as black, about five-and-a-half feet tall, wearing a purple shirt and black jeans" was in a park with a gun in his pocket. *Holmes*, 2019 IL App (1st) 160987, ¶¶ 1, 7. The sergeant relayed the information to two other Chicago police officers, who found someone matching that description within two or three minutes. *Holmes*, 2019 IL App (1st) 160987, ¶¶ 1, 8. The officers conducted a *Terry* stop and frisk of the defendant and recovered a firearm. *Holmes*, 2019 IL App (1st) 160987, ¶¶ 1, 9. *Holmes* is distinguishable for one of the same reasons as *J.L.* The officers in *Holmes* did not observe any illegal activity on their own. *Holmes*, 2019 IL App (1st) 160987, ¶ 8 (noting that at the time the officers encountered the defendant he was not doing anything visibly illegal and had no observable bulges in his pocket). Here, in contrast, Vela observed conduct that led him to believe that defendant was concealing a firearm under his clothes. We therefore find *Holmes* distinguishable.

¶ 39    Lastly, defendant makes an argument that officers having general fears about a suspect possessing a firearm does not justify a *Terry* stop. This encounter was not about having general fears of defendant possessing a firearm. This encounter was about reasonable suspicion and articulable facts of defendant possessing a firearm based on specific statements made to dispatch and the observations of officers at the scene. Those fears escalated when defendant attempted to run, while reaching towards his waistband where the gun was reported to be.

¶ 40    In short, we conclude that the trial court properly denied defendant's motion to suppress. At the time the officers searched defendant for weapons, they officers had reasonable grounds to believe that defendant was armed and dangerous, and it was necessary for the protection of themselves and others to take swift measures to discover the true facts and neutralize the threat of harm before it materialized. Moreover, the officers carefully restricted their search to what was

appropriate to the discovery of the particular item which they sought. As such, the gun seized from defendant was properly admitted in evidence against him.

¶ 41                                    B. Constitutionality

¶ 42    Defendant also argues that the aggravated unlawful use of a weapon statute infringes his rights under the second amendment and is unconstitutional, both facially and as applied to him. In support of his position, defendant relies on the test established in *Bruen*, 597 U.S. 1, for evaluating gun laws, contending that there is no analogous history and tradition to justify Illinois's requirement that a person acquire a FOID card or a concealed carry license to exercise his or her constitutional right to bear arms. The State responds that both *Bruen* and *People v. Thompson*, 2025 IL 129965, a recent decision from the Illinois Supreme Court, hold that Illinois's aggravated unlawful use of a weapon statute is not facially unconstitutional. The State further posits that defendant forfeited his as-applied constitutional challenge for failure to raise it below or develop the record and that, regardless, his as-applied constitutional challenge lacks merit. Whether a statute is constitutional is a question of law subject to *de novo* review. *Thompson*, 2025 IL 129965, ¶ 13.

¶ 43                                    1. Facial Challenge

¶ 44    The second amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The second amendment is applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV). See *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). In *Bruen*, the United States Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."

*Bruen*, 597 U.S. at 10. The *Bruen* court then set forth the following text-and-history standard for assessing the constitutionality of a firearm regulation under the second amendment:

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50, n.10 (1961)).

*Bruen* therefore requires a threshold textual inquiry followed, if necessary, by a historical inquiry. Initially, a court must ask whether the second amendment's "plain text" covers an individual's conduct. *Bruen*, 597 U.S. at 24. If the answer to this initial inquiry is affirmative, the government must defend the regulation by showing that it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To satisfy this burden, the government must show that the challenged law aligns with historical tradition by identifying analogous historical regulations, *i.e.*, those that are " 'relevantly similar' " with respect to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 28-29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

¶ 45    *Bruen* involved a challenge to a New York statute requiring a license to possess a firearm outside one's home, with the applicant having to show "proper cause," *i.e.*, a special need for self-protection distinguishable from the general community. *Bruen*, 597 U.S. at 11-12. The law gave state licensing officials considerable discretion to deny licenses, and their decisions were subject to reversal only if found to be "arbitrary and capricious." *Bruen*, 597 U.S. at 12-13. The *Bruen* court noted that 43 states, including Illinois, are "shall issue" jurisdictions, where authorities must

issue concealed-carry licenses whenever applicants meet certain threshold requirements. *Bruen*, 597 U.S. at 13. In contrast, New York and six other jurisdictions have "may issue" licensing laws granting authorities discretion to deny licenses even when all statutory criteria are met. *Bruen*, 597 U.S. at 13-15. In finding New York's "may issue" licensing regime unconstitutional, the *Bruen* court stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall issue' licensing regimes." *Bruen*, 597 U.S. at 38, n.9.

¶ 46 In *Thompson*, the defendant was pulled over following an exchange of gunfire between two vehicles on a highway. The police found an uncased, loaded handgun inside the glove compartment of the defendant's vehicle. The defendant was convicted of one count of aggravated unlawful use of a weapon based on the defendant not having a currently valid license under the Firearm Concealed Carry Act. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020). On appeal, the defendant challenged the constitutionality of Illinois's aggravated unlawful use of a weapon statute, arguing that it violates the second amendment by impermissibly restricting law-abiding citizens' right to public carriage of handguns and enforcing an ahistorical double licensing regime that mandates a concealed carry license and a FOID card. *Thompson*, 2025 IL 129965, ¶¶ 1, 13.

¶ 47 The *Thompson* court noted that in *Bruen*, the Supreme Court distinguished between "may issue" licensing regimes and "shall issue" licensing regimes. *Thompson*, 2025 IL 129965, ¶¶ 29-30. The *Thompson* court found that the Supreme Court accurately described Illinois's licensing scheme as a "shall issue" statute. *Thompson*, 2025 IL 129965, ¶ 30 (citing *Bruen*, 597 U.S. at 13 n.1). Our supreme court then found that:

> "[T]he United States Supreme Court expressly held in *Bruen* that shall-issue licensing regimes, like the one enacted in Illinois, comport with the second amendment because they do not contain the problematic features of New York's licensure regime—the unchanneled

- 23 -

discretion for licensing officials and the special-need requirement—which effectively deny the right to carry handguns for self-defense to many ordinary, law-abiding citizens. Illinois's [concealed carry license] and FOID card regulations do not have a special-need requirement and contain only narrow, objective, and definite standards guiding licensing officials rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *Thompson*, 2025 IL 129965, ¶ 42.

The *Thompson* court then adopted and applied *Bruen* to the facts before it. Applying the first prong of *Bruen*, the court initially found that the defendant's possession of a ready-to-use firearm in his vehicle constituted public concealed carriage, which was presumptively protected under *Bruen*. *Thompson*, 2025 IL 129965, ¶ 44. However, the court determined that the *Bruen* court's "express endorsement of shall-issue licensure obviates the need for this court to apply the historical-tradition component of the *Bruen* analysis to defendant's facial challenge to section 24-1.6(a)(1), (a)(3)(A-5) and its enforcement of [concealed carry] and FOID card licensure." *Thompson*, 2025 IL 129965, ¶ 44. As such, the *Thompson* court concluded that Illinois's shall-issue regime is not facially unconstitutional under the second amendment. *Thompson*, 2025 IL 129965, ¶¶ 45-46.

¶ 48    As an intermediate court, we are bound to follow precedents established by our supreme court. *People v. Moeller*, 2024 IL App (2d) 230043, ¶ 150. Therefore, in light of *Thompson*, we conclude that the provisions of the aggravated unlawful use of a weapon statute based on defendant not having a currently valid license under the Firearm Concealed Carry Act and defendant not having a currently valid FOID card are not facially unconstitutional. In his reply brief, defendant directs us to Justice Overstreet's dissent in *Thompson* (see *Thompson*, 2025 IL 129965, ¶¶ 55-87 (Overstreet, J., dissenting)) and asks us to evaluate the textual and historical analysis pursuant to *Bruen* rather than follow the *Thompson* majority. As noted above, however, when our supreme

court has declared law on any point, we are bound to follow its precedent. *Moeller*, 2024 IL App (2d) 230043, ¶ 150. Thus, we decline defendant's invitation to conduct our own analysis under *Bruen*.

¶ 49                                2. As-Applied Challenge

¶ 50    Defendant's as-applied constitutional challenge relies on the same grounds as his facial constitutional challenge. That is, defendant argues that the aggravated unlawful use of a weapon statute based on his failure to have a valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et* seq. (West 2020)) and a valid FOID card are unconstitutional based on *Bruen*. As noted, the State responds that defendant has forfeited his as-applied constitutional challenge for failure to raise it below or develop the record and that, regardless, his as-applied constitutional challenge lacks merit. Defendant has abandoned this argument in his reply brief by not responding to the State's position and by requesting in the conclusion only that we find the aggravated unlawful use of a weapon statute unconstitutional on its face. See *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 85 ("Although Daniel raises the issue of forfeiture in his brief before this court, Cynthia has not responded to it in her reply brief *** thereby effectively abandoning the [underlying] claim."); *People v. Donelson*, 2011 IL App (1st) 092594, ¶ 21 (finding that the defendant effectively abandoned contention by not referring to it in reply brief and by making arguments contrary to his position); *Mathieu v. Venture Stores, Inc.*, 144 Ill. App. 3d 783, 798 (1986) ("Venture has failed to respond to this contention in its reply brief and we deem the matter to have been abandoned.").

¶ 51    Regardless, we reject defendant's as-applied constitutional challenge for the same reason we reject his facial constitutional challenge. In his opening brief, defendant contends that the aggravated unlawful use of a weapon statute is unconstitutional as applied to him because the State

cannot point to a relevantly similar historical practice that prohibited firearm possession based on the failure to obtain government issued identification. However, as we point out above, in *Thompson*, the supreme court determined that the *Bruen* court's "express endorsement of shall-issue licensure obviates the need for this court to apply the historical-tradition component of the *Bruen* analysis" with respect to the unlawful use of a weapon statute and Illinois's concealed carry and FOID card licensure scheme. *Thompson*, 2025 IL 129965, ¶ 44. The *Thompson* court did acknowledge that the processing of any given application under Illinois's licensing regime may give rise to an as-applied challenge if the regime does not operate in a shall-issue manner in practice. *Thompson*, 2025 IL 129965, ¶ 50 (citing *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.")) Here, defendant does not allege that he applied for and was denied concealed carry licensure or a FOID card. Moreover, he does not advance or develop on appeal an argument that Illinois's licensing regime does not operate in a shall-issue manner in practice. Thus, abandonment notwithstanding, we would reject defendant's as-applied constitutional challenge.

¶ 52                                    III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 54    Affirmed.